**J. D. THORNTON et al., Plaintiffs-Appellants,**

v.

**EAST TEXAS MOTOR FREIGHT et al., Defendants-Appellees.**

Nos. 73–1353, 73–1354.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 11, 1974.

Decided May 21, 1974.

See also, 6 Cir., 454 F.2d 197.

Anthony J. Sabella, Memphis, Tenn., Gerald D. Letwin, E.E.O.C., Washington, D. C., as amicus curiae for plaintiffs-appellants, cross-appellees; William A. Carey, Gen. Counsel, Joseph T. Eddins, Acting Associate Gen. Counsel, Beatrice Rosenberg, Charles L. Reischel, Attys., E.E.O.C., Washington, D. C., on brief.

Harry A. Rissetto, Washington, D. C., L. N. D. Wells, Jr., Dallas, Tex., Howard R. Paul, Memphis, Tenn., for defendants-appellees, cross-appellants; James W. Watson, Memphis, Tenn., (Watson, Lewis & Knolton, Memphis, Tenn., of counsel), Richard C. Hotvedt, Washington, D. C. (Morgan, Lewis & Bockius, Washington, D. C., of counsel), on brief.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and CONTIE * District Judge.

WEICK, Circuit Judge.

These appeals deal with complicated issues of appropriate relief in an employment discrimination action.

Plaintiffs filed a class action in the District Court alleging that defendants East Texas Motor Freight (Company), Teamsters Local 667 (Union), Southern Conference of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America violated Title VII of the 1964 Civil Rights Act by discriminatory practices occurring at the company's Memphis Terminal.

The District Court granted motions to dismiss Southern Conference of Teamsters and the International Brotherhood of Teamsters, with the result that the case proceeded against only the company and the local union. No error has been assigned with respect to that order.

The company employs both city drivers and over-the-road drivers who operate between different states. Both types of drivers operate basically the same kind of equipment, namely, tractors and trailers. Road drivers work much longer hours and spend more time away from home. Road drivers earn about $16,500 per year, while city drivers earn $12,500 per year.

At the time of trial the company employed at its Memphis terminal 105 road drivers (all white), and 131 city drivers (of whom 43 were black). The two kinds of drivers were covered by sepa-

---

* The Honorable Leroy J. Contie, Jr., Judge, United States District Court for the Northern District of Ohio, sitting by designation.

rate collective bargaining agreements and were on separate seniority lists.

From 1954 to 1972 it was company policy not to permit transfers from the position of city driver to road driver. Beginning in January, 1972, the company changed its policy, and permitted transfers to road positions by city drivers, but those city drivers who transferred lost their seniority for bidding and layoff purposes, but retained their seniority for compensation and fringe benefits, such as pension, vacation, and welfare purposes.

The District Court found that the past policy of no transfer, although the policy affected whites and blacks alike, was racially motivated and was not justified entirely by business necessity. The company had hired no blacks as road drivers. As a result the District Court found a violation of Title VII, and entered an order specifying relief.

In regard to seniority the Court ordered that black city drivers who specifically requested a transfer or who filed a charge with Equal Employment Opportunity Commission (EEOC) were entitled, upon transfer to a road position, to have their seniority commence from six months after the date of their request but not earlier than January 2, 1966. Black city drivers who made no prior request to transfer were held, upon later transfer, to have their seniority in the road position to be considered from eighteen months after the time such black city driver had qualified to be a road driver, but no earlier than July 1, 1970. After two years of city driving an employee was presumed to be qualified for a road position.

The District Court also granted back pay relief to those black drivers who could show economic loss for discriminatory failure to grant a transfer request. The period for such claims was limited to a time period beginning January 1, 1966, and ending January 1, 1972. The District Court referred to a Magistrate the determination of the amount of back pay or seniority rights due to specific blacks.

The District Court ordered the company to rescind its no-transfer rule and enjoined it and the union from engaging in discriminatory acts and practices at the Memphis terminal. The Court assessed attorneys' fees against the company and the union, and relieved nine union members from payment of dues for a certain period of time, and relieved other minority union members from sharing in legal expenses and costs.

The plaintiffs appealed, asserting that the remedies granted were insufficient. The union cross-appealed. EEOC, as amicus curiae, filed a timely brief, supporting plaintiffs' claims of inadequacy of relief. Plaintiffs filed a non-timely brief adopting the brief of EEOC.

## SENIORITY

EEOC urges that the District Court should have granted a full seniority carry-over for transferees. It contends that transfers without full seniority carry-over place a burden on those transferring and thus perpetuate past discrimination.

We reject EEOC's argument. We think the wisest course lies in following the reasoning of Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973), which case involved a factual situation much like the one in the case at bar. In *Bing* the Fifth Circuit followed the "rightful place" theory enunciated in its prior decision in Local 189, United Papermakers, etc., AFL–CIO v. United States, 416 F.2d 980 (5th Cir. 1969). Under this theory the black city drivers would be given opportunity to move into positions they would have occupied but for the wrongful discrimination against them.

As far as seniority is concerned, the "rightful place" theory requires the giving of enough seniority to insure that a black city driver will achieve the advancement and bidding rights that he otherwise would have enjoyed, and also that those discriminated against will have the protection against layoff which they would have were it not for discrimination.

■ The position urged by EEOC is inconsistent with the "rightful place" theory when applied to our case. The approach suggested by EEOC would give to those who transfer to road positions more seniority than they would have had in the absence of discrimination.

In the present case a city driver was presumed to be qualified to be a road driver after he operated, as a city driver, equipment similar to the road equipment, for two years (absent a showing to the Magistrate of earlier qualification). If city drivers were not qualified to be road drivers until they had worked for two years on a city position, their job seniority in the road line positions should not be dated any time prior to the fulfillment of the two year period of qualification. As the Court said in *Bing*:

> Before that date [of qualification] discrimination could not have blocked their employment as road drivers. (*Id.* at 451).

Having rejected EEOC's claim, we must still evaluate the propriety of the seniority relief given by the District Court. That relief gave to those drivers who requested a transfer or who filed an EEOC charge, a seniority date of six months after the time of request or charge. Those drivers who did not so register an indication of dissatisfaction were given seniority from a time eighteen months after a time when they were determined to be qualified.

■ This seniority relief is different than that granted in *Bing* where all drivers, regardless of whether they had requested transfer or made complaints, were given the same seniority rights dating from the time they possessed the experience necessary for them to qualify for a road job. The theory justifying such relief was that it would have been futile to make a request for transfer. Action which is futile ought not to be required as a prerequisite to recovery. Jones v. Leeway Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970); United States v. Sheet Metal Workers,

Local 36, 416 F.2d 123, 132 (8th Cir. 1969); Lea v. Cone Mills Corp., 301 F. Supp. 97, 102 (M.D.N.C.1969), aff'd in pertinent part, 438 F.2d 86 (4th Cir. 1971); Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967).

■ In the present case it is clear that attempted transfers were refused automatically until January 1, 1972; however, unlike *Bing*, a transfer request was not the only mechanism by which the District Court decided to measure seniority. The filing of a charge with EEOC also would establish a commencement date for seniority purposes. We cannot say that such a filing and following it with court action was a futile gesture, especially when the suit turns out to be successful. The District Court stated that one of its reasons for determining earlier seniority for those drivers who actively sought an end to the company's no-transfer policy, was that such persons should benefit more "than those who were merely passive and indicated no particular desire to transfer or made no effort to bring about . . . an end to this restrictive policy." (Memorandum Opinion, Dec. 28, 1972, at p. 7). We also think there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination. Such a decision by the District Court can hardly be considered an abuse of discretion, which must be shown before remedial relief of a court can be overturned.

Moreover, in *Bing* there was only one charge filed with EEOC. In the case at bar twenty-one city drivers of both races filed charges with EEOC. The controversy involved both labor relations and a racial dispute. Given the large number of charges filed, we think the District Court was entirely within its discretion in not granting seniority relief like that granted in a case where silence and futility of protest was the norm.

It may be impossible to put persons in their rightful place in a factual situation such as this where only an approxi-

mation may be possible. For example, we do not think the seniority relief granted in *Bing* is a strict application of the "rightful place" theory. An employee might have become qualified to be a road driver on a given date, but he may have had absolutely no desire on that date to become a road driver. Yet the *Bing* decision gave that employee a seniority date as of the time of his qualification.

The rationale in *Bing* was that silence might be caused by a belief in the futility of a transfer request. That may be true, but also it may be caused by no desire to transfer. The District Judge is in the best position to determine this issue. On the facts of this case we cannot say that the District Court erred in finding that the "rightful place" theory could be best implemented by looking to time of application for transfer or time of filing of charge.

■ The only remaining question on seniority is whether the seniority date of those black city drivers who requested transfer or who filed a complaint, should be delayed six months from the date of request. We think that this was a discretionary matter with the District Court, and we can find no abuse of discretion.

The dissent recognizes the difficulties confronting the District Judge in fashioning appropriate relief under the facts peculiar to this case, which are not the facts present in other cases cited.

The jobs of city and road drivers were treated as separate units and were covered by separate collective bargaining agreements. The company had never permitted transfers of either blacks or whites from city to road driver jobs, so it cannot be said that this policy was aimed at blacks only. Furthermore, the Court found that no black driver had ever applied "off the street" for an over-the-road job. In determining seniority the District Court had to be very careful not to dislodge existing over-the-road drivers who rightfully held

their jobs and were properly performing them.

The legislative history of Title VII, as pointed out in the dissent, shows a clear Congressional intent to lodge wide discretionary powers in District Judges in fashioning remedies. In our judgment the District Judge did not abuse his discretion in fashioning the remedy in this case.

## BACK PAY

The District Court allowed back pay relief to those black city drivers who were qualified and desirous of transfer and who could show economic loss as a result of failure to be transferred. The Court limited the period of the back pay award form January 1, 1966 to January 1, 1972. The District Court referred the case to a Magistrate who was to determine the amounts due to given individuals. EEOC challenges various portions of the guidelines given to the Magistrate by the District Court.

Before discussing the various claims raised by EEOC it is important to establish our standard of review over this question. In Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973), this Court held:

> Congress evidently intended that the award of back pay should rest within the sound discretion of the trial judge. (*Id.* at 876).

■ This holding establishes that whether back pay should be awarded at all is a matter of discretion. Likewise we feel that after the decision to award back pay has been made, the formula of computation and the determination of recipients are also matters within the discretion of the District Court.

The District Court limited back pay relief to those drivers who had indicated a desire to transfer to over-the-road positions. EEOC urges that all black city drivers who have transferred or who are interested in transferring, should be entitled to make a claim for back pay, irrespective of any previous desire to assume a road position.

The District Court was of the view that a driver's past expression of interest in a road position served as a good criteria to determine who was actually injured by the no-transfer rule. EEOC contends that such a futile act should not be determinative of back pay eligibility. We think the District Court action may be supported on several grounds.

■ First, the order of the District Court did not make back pay relief awardable only to those employees who had formally requested transfer or who had filed complaints, but to those drivers who had indicated a desire to transfer. This provides a flexible standard for the Magistrate to apply, which standard will make allowances for informal indications of interest. Second, there was a large number of black and white city drivers who protested against the no-transfer rule. This case was a far cry from many reported cases wherein the clear futility of an action led to a general lack of protest. Third, the prospect of a large back pay award invalidates present intention as an accurate indication of past intention. An employee who may not have wanted on-the-road employment in the late 1960's because of the increased number of hours of work and time away from home, might well change his mind now if the prospect of a large back pay windfall is present. We do not think that the District Court abused its discretion in finding that past actions and indications are more accurate indicators of past intention than present actions.

■ In its order granting relief the District Court allowed to employees who qualified and who desired transfer, back pay relief for a time period commencing January 1, 1966, and ending January 1, 1972.

EEOC contends that the commencement date should be July 2, 1965, the effective date of Title VII and the 1964 Civil Rights Act. The impact of the six-months delay is minor since only two road drivers were hired between the effective date of the Act and December 31, 1965. EEOC further contends that the ending date should be extended to the date when the Court makes a final award of damages.

In our opinion, these issues likewise involve matters within the sound discretion of the District Court. We find no abuse of discretion.

### INTERIM EARNINGS

■ The District Court ordered that back pay was to be reduced by the claimants' earnings during the relevant time period. There is no specific mention in the District Court's opinion of whether moonlight earnings will be deducted. EEOC contends that moonlight earnings should not be deducted. This position is contrary to the holding of the Fifth Circuit in *Bing* (at page 454) that moonlight earnings were "interim earnings" within the meaning of 42 U.S.C. § 2000e–5(g). That Court pointed out that the road driver who works from sixty to one hundred hours per week is unable to moonlight. The city driver who works fewer hours on his regualr job is able to moonlight and earn more than the road driver. In our opinion the Fifth Circuit, in ordering the deduction from the damage claim of the amount of moonlight earnings, correctly applied the statute and reached a just and equitable result.

### NOTICE

In its order of December 28, 1972, the District Court gave to any affected party sixty days within which to file a written claim, generally stating the basis of his claim. On January 15, 1973 the company sent to members of the class a copy of the District Court's order. The company's cover letter stated that the order was attached and instructed the recipient:

Read the enclosed carefully and take such action as may be necessary to protect your interest, if any.

EEOC challenges the form of this notice, not the legality of the District

Court's requirement that the class members make a response of some kind. EEOC urges that the notice was defective in that the company's cover letter failed to inform recipients that certain action on their part was required to protect their rights. EEOC relies heavily on the notice in *Bing, supra*, where the cover letter itself told the employees what they were required to do to preserve their rights. *See Bing supra*, n. 3 for the precise notice sent. EEOC argues that in the case at bar the cover letter gave no indication of how to proceed but merely referred the recipients to the order, one paragraph of which told them exactly how to protect their rights. EEOC contends that such notice is insufficient since the recipients are not sophisticated litigants and the steps they were required to follow were buried in the back of a technical, complex order. The company contends that the notice was sufficient since it was written in clear, understandable language.

■ In our opinion the District Court had authority to require a response to the notice. It was not claimed that these truck drivers could not read or write. The plaintiffs were represented by counsel who did render assistance in providing names. Paragraph seven of the District Court's order gave plaintiffs a right to participate in the wording of the notice:

> Plaintiff's counsel will also, and E. E.O.C. may, assist in providing names of those to whom notice will be sent and content of the notice in order that such persons may pursue their claim for relief or remedy under the terms hereof.

EEOC claims it was never given an opportunity to review the notice. Even so, there has been no violation of the District Court's order. Only the plaintiffs' counsel had a right to participate. EEOC made no request to participate in the preparation of the notice, and its participation was not mandatory under the order of the Court.

■ There has been no claim that plaintiffs' counsel failed to take part in preparation of the notice. He did co-operate in providing names and addresses. Never did he object to the form of the notice. EEOC, as amicus curiae, has no independent standing by which it can avoid facing the effects of any actions by plaintiffs' counsel.

## UNION'S APPEAL

The local union has cross-appealed. It does not challenge the seniority relief given, but it protests an assessment of attorneys' fees against itself. It also challenges the District Court's action in relieving certain plaintiffs from payment of union dues for a given time and in relieving minority union members of their obligation to participate in the sharing of the cost and expense of this litigation. Finally, it challenges the District Court's order enjoining the union from engaging in acts of discrimination.

The union contends that the District Court had no jurisdiction because none of the plaintiffs filed a charge with EEOC. Such a charge is essential to jurisdiction. LeBeau v. Libbey-Owens-Ford Co., 484 F.2d 798 (7th Cir. 1973), and Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969).

When Thornton and the other plaintiffs first filed charges with EEOC in 1966 the company was the only named respondent. Fragmentary records of EEOC indicate that Thornton and some others of the plaintiffs filed charges with EEOC in 1968 against both the company and the union. There was testimony by certain employees that they had not filed EEOC charges against the union. Plaintiff Rector so testified and the records confirmed that Rector had not filed a charge against the union. However, an affidavit was filed by Director Dixon of the Memphis office of EEOC, which affidavit stated that Thornton and eight other persons had filed charges against both the company and the union in 1968, but that these charges had been lost. This officer did

indicate that the "Charge Control Action Memos" kept on each charge in the regular course of the business were the only existing evidence of the filing of these charges. Since the charges have been lost, we can only infer that they may have related to the same matter as the previous charges against the company.

There is no dispute that in 1969 Thornton and eight other plaintiffs received from EEOC right-to-sue letters, in which the local union was named along with the company.[1]

The union argues that even if charges were filed, it never received notice of them. The District Court considered the issue of jurisdiction over the union and found that the union had participated in conciliation discussions before EEOC, and clearly knew of the charges of discrimination. The District Court also expressed the view that individual plaintiffs should not be penalized for administrative laxity or ineptness on the part of EEOC.

■ We are of the opinion that the District Court had adequate basis to assert jurisdiction over the union. The law is clear that there are only two requirements that plaintiffs have to meet in order to give the District Court jurisdiction over the union: 1– There must be a filing of a charge with EEOC naming the respondent; and 2– There must be a suit filed in Federal Court within thirty days of receiving the right-to-sue letter. Local 179, United Textile Workers, AFL–CIO v. Federal Paper Stock Co., 461 F.2d 849, 850, 851 (8th Cir. 1972); Beverly v. Lone Star Lead Const. Corp., 437 F.2d 1136, 1140 (5th Cir. 1971); Dent v. St. Louis-San Francisco Ry., 406' F.2d 399, 403 (5th Cir. 1969).

■ In addition, service of the EEOC charge upon the named defendants is not a jurisdictional prerequisite to institution of an action in the District Court. John v. ITT-Thompson Indus., Inc., 323 F.Supp. 1258, 1260 (N. D.Miss.1971); Logan v. General Fireproofing Co., 309 F.Supp. 1096, 1099 (W.D.N.C.1969); Holliday v. Railway Express Co., 306 F.Supp. 898 (N.D.Ga. 1969). The basic rationale relied on in these opinions is' stated clearly in Quarles v. Philip Morris, Inc., 271 F. Supp. 842 (E.D.Va.1967):

> The plaintiff is not responsible for the acts or omissions of the Commission. He, and the members of his class, should not be denied judicial relief because of circumstances over which they have no control. (*Id.* at 846–847).

■ There is no doubt that the right-to-sue letters were received and that the suit was timely filed. The only dispute is whether a charge was filed against the union. The control cards clearly show that the union was named as a respondent in an EEOC charge. These cards, combined with union participation in conciliation discussions, are sufficient to support jurisdiction.

## UNION DISCRIMINATION

The District Court made the following finding with respect to union discrimination:

> Under all circumstances, we conclude that the defendant union *acquiesced* in the "no transfer" rule in question probably because of the fear of offending its white road driver members, despite the fact that both black and white city drivers complained about this policy. (Emphasis added).

1. The record includes a written decision of EEOC on charges filed by twenty-two named charging parties against the company, as respondent, dated July 31, 1968, concerning charges filed September 23, 1966. The union was not named as respondent in the decision, or even referred to therein. Charges allegedly filed in 1968 are not included therein. Charging parties Coleman, Nunnly and Miller, included in the Dixon affidavit, do not appear in the decision as charging parties. No written decision on the alleged 1968 charges appears in the record. Apparently all that EEOC did was to include the union in the right-to-sue letter.

The union contends that this finding is not supported by substantial evidence and is clearly erroneous.

It is noteworthy that there is no evidence or finding that the union connived or conspired with the company, or with anyone else, to discriminate against the plaintiffs. As we will point out, it is indeed very questionable whether the union ever acquiesced, let alone acquiesced for fear of offending its white driver-members, who were just as much interested in eliminating the no-transfer rule as were the black drivers.

The District Court further found that no black person had ever applied to the company "off the street" for a road job. The gist of the plaintiffs' case was that the no-transfer rule of the company was discriminatory as to blacks. The fact is, however, that the no-transfer rule was applied by the company indiscriminately against both white and black drivers since the rule was adopted in 1954 and until the rule was eliminated in 1972.

It is argued that the rule nevertheless perpetuated past discrimination against blacks. But this was discrimination by the company against blacks, and not by the union.

The employment of drivers for city and for over-the-road driving was a management function exercised exclusively by the company and without interference by the union.

Traditionally, from the inception of collective bargaining, city and over-the-road drivers have been placed in separate units for collective bargaining purposes. The National Labor Relations Board has long held that this separation was appropriate. In Re Georgia Highway Express, 150 NLRB 1649 at 1651 (1965). Separate collective bargaining agreements cover each unit. There was no proof that the race of the persons involved ever had anything to do with the establishment or maintenance of these separate units.

The company contended that it had a legitimate business purpose for the adoption of its no-transfer rule. Although the equipment operated by drivers in the two units was substantially the same, the duties of the drivers and the driving conditions were much different. The company offered proof of its accident rating as a result of its rule, which rating was only slightly higher than one-half of the national average accident rating in the trucking industry. The District Court said:

No doubt the company has good business reasons for maintaining separate rosters for these drivers for some purposes, but it is abundantly clear also that many black city drivers have been absolutely denied an opportunity to gain the much better paying road driver positions by reason of this policy until 1972.

The same could be said, with equal force, concerning white city drivers who were not permitted to transfer.

It should be pointed out further that the collective bargaining agreements which were entered into between the Southern Conference, the International Brotherhood of Teamsters, and the company, contained no provision prohibiting transfers. These agreements were submitted to and approved by the union membership in 1964, 1967, and 1970. There is proof, however, that in 1967 the local union submitted to the bargaining committee a proposal to eliminate the no-transfer rule, but the company declined to accede thereto. The Southern Conference and the International Brotherhood of Teamsters, which are responsible for entering into the collective bargaining agreements, have been dismissed from this case. The local union ought not to be held liable for any act or dereliction on their part.

None of the plaintiffs ever filed a grievance against the company on account of its no-transfer rule, nor did the plaintiffs or any union member ever request the union to process a grievance against the company. This would indicate rather clearly that the union members, including the plaintiffs, were well

satisfied with the collective bargaining agreements.

Under these circumstances the union could not be held liable for failure to perform duties under the agreement, such as the duty to represent fairly its members. Dill v. Greyhound Corp. 435 F.2d 231, 237–238 (6th Cir. 1970); Balowski v. International Union, UAW, 372 F.2d 829, 834 (6th Cir. 1967).

 Plaintiffs' claim, however, is for discrimination in employment, and is not based on the collective bargaining agreements, but it is brought under Title VII. Such claim is not barred because of failure to pursue remedies under the collective bargaining agreement. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (decided Feb. 19, 1974).

The type of discriminatory activity for which a union may be held liable is portrayed in Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This case is a far cry from *Steele*.

It is indeed a serious matter for a local union to be charged with discrimination against its own members on account of their race, in violation of Title VII, particularly when all the proof shows that it had knowledge of the employer's alleged discrimination, and that it did not initiate any action to stop it until 1967.

 None of the plaintiffs or other union members ever requested the union to take action. A strike could have been called against the company, but a union does not ordinarily resort to that drastic procedure unless its members want to strike. There is no indication in the record that the plaintiffs or the other union members wanted to strike.

We think the plaintiffs did exactly what they wanted to do, namely, they filed a charge against only the company in 1966. It was not until 1968 that charges were filed against the union, and we do not really know what the charges were because EEOC has lost them. When ruling on the 1966-charges on July 31, 1968, EEOC in its decision never mentioned the union. The local union was included only in the right-to-sue letter sent to the plaintiffs.

The plaintiffs do not need an injunction against the union. They have an injunction against the company which caused the alleged violation by adoption of the no-transfer rule.

The District Court allowed $6500-attorneys' fees to counsel for plaintiffs, of which $2,000 was to be paid by the union. The District Court, on remand, may require the company to pay the entire fee.

 We do not think it was appropriate for the District Court to remit membership dues to some of the plaintiffs for a certain period of time. These members received the benefits of the collective bargaining agreements and have never questioned the agreements. Furthermore, these members made no claim for such relief, nor for the union not to use their dues to pay costs and expenses of this litigation.

We are of the opinion, for the reasons stated, that the finding of the District Court against the union, above set forth, is not supported by substantial evidence, and is clearly erroneous.

The judgment of the District Court is affirmed in case number 73–1353, and is reversed in case number 73–1354. The case is remanded for further proceedings not inconsistent with this opinion.

PHILLIPS, Chief Judge (dissenting in part, concurring in part).

I respectfully dissent from those parts of the majority opinion that are labeled "Seniority" and "Back Pay," and concur with the remainder.

In granting seniority relief, the District Court distinguished between those city drivers who had requested transfer by notifying the company or the local union or by complaint to the E.E.O.C. and those drivers who had not requested transfer. The former, if qualified for road driving at the time of the request, would be afforded a seniority date begin-

ning six months after the initial request, but in no event earlier than January 2, 1966, six months after the effective date of Title VII. Those drivers who did not affirmatively request transfer would have seniority status from July 1, 1967, or 18 months after they became qualified for a road position, whichever is later.

My understanding of the Congressional intent in enacting the relief provisions of Title VII, 42 U.S.C. § 2000e–5(g), is that the victims of unlawful discrimination must be made whole and restored to the position where they would have been except for the unlawful discrimination. The Senate-House Conference Report for the relief section of the 1972 Amendments to Title VII states:

"The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." Section-by-Section Analysis, Congressional Record (H. 1863), March 8, 1972.

The courts have the power and responsibility to structure equitable relief that will eradicate the present and future effects of past discrimination. *See e. g.*, Head v. Timken Roller Bearing Co., 486 F.2d 870, 876 (6th Cir. 1973); Bing v. Roadway Express, Inc., 485 F.2d 441, 450 (5th Cir. 1973); United States v. Georgia Power Co., 474 F.2d 906, 927 (5th Cir. 1973); United States v. Local 212, Electrical Workers, 472 F.2d 634, 636 (6th Cir. 1973); United States v.

Local 169, Carpenters, 457 F.2d 210, 216 (7th Cir. 1972); United States v. Hayes International Corp., 456 F.2d 112, 117 (5th Cir. 1972); United States v. Bethlehem Steel Corp., 446 F.2d 652, 660 (2d Cir. 1971). Although the nature of equitable relief under Title VII is discretionary, it must, nevertheless, be exercised in a manner consistent with the *purpose behind the statute.* Head v. Timken Roller Bearing Co., *supra,* 486 F.2d at 876–877; Moody v. Albemarle Paper Co., 474 F.2d 134, 141 (4th Cir. 1973).

Seniority may be largely determinative for bidding and layoff purposes. Relief that artifically limits seniority status maintains the status quo and operates to "lock-in" those employees who were victims of the unlawful discrimination. In my view, it is logical to conclude that employees with less seniority would be discouraged from transfer to road positions just as effectively as if the no transfer rule had remained in force. I consider such a result to be in direct conflict with Title VII in that it preserves the vestiges of past discrimination.

In my opinion it is necessary to provide the victims of the unlawful discrimination with that amount of seniority they would have had except for the discrimination. This amount of seniority will provide each such employee with enough incentive to transfer into a road position and will insure that he maintains his rightful place in the company by protecting him against layoffs. I, therefore, would adopt the "rightful place" theory announced by the Fifth Circuit in Local 189, Papermakers & Paperworkers v. United States, 416 F.2d 980, 988 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), and recently reaffirmed in *Bing, supra,* 485 F.2d at 450–451, and structure seniority from the time the city driver became qualified for a road position. White incumbent road drivers would not be bumped out of their present positions and, therefore, should not complain of "being deprived only of

that which they received as a consequence of discrimination." United States v. Roadway Express, Inc., 457 F. 2d 854, 856 (6th Cir. 1972).

In my judgment, this seniority relief should be available regardless of whether the employee requested a transfer to a road position or filed a charge with the E.E.O.C. The majority opinion states that "there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination." Any such "reward" should not be at the expense of the other victims of the discrimination. Title VII was enacted to protect *all* employees from unlawful discrimination. This is especially true where the discrimination intimidated the employees to such an extent that they felt it would be futile to request a transfer.

As stated in *Bing, supra*, 485 F.2d at 451:

"We recognize the logic of that argument, but it fails to account for the realities of entrenched employment discrimination. If an employee realizes full well that blacks simply are not hired as road drivers, why should he bother to apply? Certainly a few, such as Bing, have the courage to fight 'the system,' but it is equally certain that others must have been intimidated and discouraged by Roadway's discriminatory practices. For that reason we believe it is an unsound policy to date transferees' job seniority from their first application for transfer."

The majority opinion distinguishes *Bing, supra*, on the basis of the number of charges filed. The opinion states: "Given the large number of charges filed [21], we think the District Court was entirely within its discretion in not granting seniority relief like that granted in a case [*Bing*] where silence and futility of protest was the norm." I view that as a distinction without a difference. This reasoning loses sight of the purpose behind the remedy provisions of Title VII. The statute was designed to make the discriminatees whole and applies especially to those who were totally and completely intimidated and who thought that any request would be futile.

The facts of this case indicate that such a belief was well founded. The no transfer rule had been in effect since 1954. Even the large number of transfer requests and charges did not cause the company to alter its position. It was not until the instant lawsuit had been in progress over two years that the company retreated from its no transfer rule. Even then, the rule that was adopted in January 1972, although permitting transfers to road positions, was discriminatory in its prohibition against full seniority carryover in that it denied any carryover for bidding and layoff purposes.

In the face of the company's long history of discrimination it is no wonder that many city drivers were deterred effectively from seeking transfer to road positions.

With respect to back pay, the District Court allowed relief for black city drivers who were qualified, could show economic loss as a result of the no transfer rule and who had been desirous of transferring to road positions. This relief was limited to the period from January 1, 1966 to January 1, 1972.

In Head v. Timken Roller Bearing, *supra*, this court said:

"Congress evidently intended that the award of back pay should rest within the sound discretion of the trial judge. Although appellate courts are loathe to interfere with the exercise of such discretion by a trial court, it is recognized that it is not free from appellate scrutiny." 486 F. 2d at 876.

Title VII became effective on July 2, 1965, and at that time all qualified city drivers had a legal right to road positions. *Bing, supra*, 485 F.2d at 453. Although an award of back pay is discretionary, the exercise of that discre-

tion must have a reasonable basis in the record. There is nothing in the record to indicate to my satisfaction that the choice of January 1, 1966, as the starting date for back pay had any basis. Rather, it was chosen without explanation and in my opinion constitutes an abuse of discretion.[1]

I would begin the period for back pay on July 2, 1965, the effective date of Title VII. *See* Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 878; Bing v. Roadway Express, *supra*, 485 F.2d at 453.

The date of January 1, 1972, was chosen because that was the day the company rescinded the no transfer rule. I am convinced that, nevertheless, it was an abuse of discretion to limit back pay to that date. The new transfer rule was still discriminatory in that there was no seniority carryover for bidding and lay-off purposes. For some employees, this lack of carryover was just as effective a deterrent to transfer as was the no transfer rule.

Because of the prospect of a windfall, unlike seniority relief, I think it proper for back pay purposes to distinguish between those who had indicated a desire to transfer and those who did not. I would hold that those who had indicated such a desire prior to the District Court's Order of December 28, 1972, are entitled to back pay from July 2, 1965, or the date the employee became qualified, whichever is later, until the date on which the employee was eligible to transfer with full seniority carryover, i. e., the date on which there were no longer any unlawful limitations. *See e. g.,* Head v. Timken Roller Bearing Co., 486 F.2d at 875, 878. Those employees who did not indicate a desire to transfer prior to the District Court's order should be awarded back pay from the

date they requested transfer, assuming they were qualified, until the date they were eligible to transfer with full seniority carryover. All payments should be contingent upon actual transfer, and, therefore, should be held in escrow until the road position opens up and the employee actually effects a transfer.

The E.E.O.C. contends that back pay relief should be given on an equal basis to those drivers who are willing to transfer now and do transfer even though they never indicated a past desire to transfer. They, in effect, argue that a present desire to transfer is an indication of past desire. The E.E.O.C. also favors back pay relief for those who had indicated a desire to transfer but no longer desire a road position.

The fallacy with the former position is that a present desire to transfer with the prospect of a back pay windfall is not a reliable indication of past desire. It would be an abuse of the court's discretion and an inequitable use of the court's power to sanction windfall payments. The error in the E.E.O.C.'s latter position is that a past desire to transfer when coupled with no present desire may be an indication that the employee never really wanted to transfer and, therefore, suffered no economic harm.

Only with the previously enunciated distinctions coupled with actual transfer can the court approximate the true intentions of the parties and provide equitable relief. Any broader relief would be punitive in nature and would not be consistent with the purpose of making the discriminatee whole. It is to be emphasized that equitable relief under Title VII is, at best, inexact. I believe that the back pay solution suggested in this dissenting opinion is fully consistent with the Congressional intent behind the back pay provisions.

---

1. For the same reason, the six month delay in seniority for those employees who had actually requested transfer or filed a charge with the E.E.O.C. was arbitrary and an abuse of discretion. Even assuming the date of the request was proper, seniority should not have been delayed six months.