**John SENTER, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, INLAND DIVISION, Defendant.**

**Civ. No. 4154.**

United States District Court,
S. D. Ohio, W. D.

Sept. 11, 1974.

Ted W. Rice, Dayton, Ohio, for plaintiff.

Charles P. Pfarrer, of Cowden, Pfarrer, Crew & Becker, Dayton, Ohio, for defendant.

**FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW**

CARL B. RUBIN, District Judge.

This matter is before the Court following trial, presentation of evidence

3. *See* note 2, *supra.*

and testimony, and submission of memoranda by counsel. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court does determine the following findings of fact and conclusions of law.

## I

### FINDINGS OF FACT

1. Plaintiff is a black male formerly employed by defendant at its plant in the City of Dayton. Plaintiff's employment began in 1967 and terminated in 1973. During his period of employment, plaintiff did not at any time occupy a supervisory position.

2. During the time covered by plaintiff's employment the production employees of defendant were represented by Local Union 87 of the United Rubber, Cork, Linoleum & Plastic Workers of America. Two collective bargaining agreements covered the period from 1967 to 1973. The parties have stipulated that the collective bargaining agreement for the period from 1967 to 1970 contained, insofar as pertinent to this matter, identical provisions to the agreement from 1970 to 1973 (Ex. J).

In accordance with the earlier agreement, plaintiff in 1969 was elected as an Alternate Committeeman authorized to represent employees in grievance procedures when the regularly elected committeeman was not present in the plant.

3. The Inland Division of General Motors Corporation produces component parts for an automobile including, by way of example, brake hose, engine mounts, flexible body components, steering wheel pads, steering wheels, deck strips, flexible body fillers, brake linings, weather stripping, and so forth. During the period of plaintiff's employment the defendant employed at two plants in the Dayton area, between five and six thousand employees.

4. While an employee, plaintiff was disciplined three times: In June of 1970, in January of 1971, and in December of 1971. The incidents of January, 1971 and December, 1971 were treated as grievances for arbitration purposes and opinions rendered by impartial umpires (Defendant's Ex. F and G). An examination of the incidents and the determinations of the umpires indicate no issue of significance to plaintiff's complaint of discrimination.

In each instance the impartial umpire substantially reduced plaintiff's suspension. In the incident of January, 1971, a disciplinary layoff was reduced from twenty-one days to balance of shift plus one day. In the incident of December, 1971, a thirty-day disciplinary layoff was reduced to balance of shift plus one week. In each instance, plaintiff violated shop rules and exceeded normal standards of conduct. The disciplinary incident of June, 1970, will be treated separately herein.

5. The relevant labor market for industries in or near Dayton, Ohio, consist of the counties of Greene, Miami, Montgomery and Preble, known generally as "the Miami Valley region." The 1970 census indicates a black population of Montgomery County of 13.75% and a black population of the Miami Valley region of 12.15%.[1] While the total black employment of defendant has varied narrowly between 1966 and 1973, the same is not true of black supervisory personnel. In 1966 black employment was 14.5% of the total; in 1973 it was 16.74%. During a period of plant-wide layoffs in 1971 it was as low as 13.28%. There is general agreement between the parties as to these figures (Plaintiff's Brief, p. 1(a); Defendants' Brief, Appendix A).

There are some fractional differences as to black supervisory employees between the exhibits presented during trial and the briefs of the parties. The parties, however, are now in substantial agreement, as shown by their briefs, and

---

1. Source: Plaintiff Appendix: "Population, Housing, Income in the Miami Valley Region, August, 1972, prepared by the Research Department of the Miami Valley Regional Planning Commission."

these figures will be accepted by the Court. According to such briefs the percentages of black supervisors are as follows:

| Date | Percentage |
|------|-----------|
| 1966 | 0.90 |
| 1967 | 1.50 |
| 1968 | 1.51 |
| 1969 | 2.38 |
| 1970 | 2.66 |
| 1971 | 3.53 |
| 1972 | 7.63 |
| 1973 | 9.14 |

In the six years between 1966 and 1971 the percentage of black foremen increased on an average of ½ of 1% per year. In the next two years the percentage increased from 3.53% to 9.14% or an average of 2.8% increase per year. It is during this period that the STEAM program was conceived and initiated.

6. Prior to September of 1971, there was no formal method of selecting supervisors. Foremen and plant supervisors would suggest candidates. Employees could apply at the Personnel Department by using a transfer form referred to in paragraph 55 of the collective bargaining agreement or by informally advising a foreman of their interest. Foremen were not required to advise Personnel of such interest. No effort was made to interest employees in general in promotion, no posting of openings was made, and no formal method of selection had been developed.

In September of 1971, a program known as "STEAM" was instituted. The term, "STEAM" stands for Selection Training Education Affirmative Management. It became a specific formal effort at recruiting and selecting foremen candidates. Employees were advised of the opportunity and an effort made to interest employees, both black and white, in promotion. Those selected were given comprehensive instruction and an opportunity to qualify as supervisors. Seven groups of employees were selected and trained under the STEAM program to October, 1973 (Ex. A–E). In such seven groups were 57 employees,

40 male—17 female. Of the males, 14 were black—26 were white.

The STEAM program is nondiscriminatory in its selection process, it is based upon racially neutral criteria and offers an equal opportunity to blacks and whites for promotion and entrance into supervisory ranks.

7. On June 8, 1970, plaintiff endeavored to present a "Group Grievance" on grievance forms provided by management. The grievance contains the number "46719," (Ex. C.). The grievance written in something less than precise language charged the defendant with discriminating in promotional opportunities against Negro employees. The grievance was signed by the plaintiff as an employee and by one Fred Jackson who endorsed the grievance at the top. It was not endorsed by a District Committeeman as required by the Collective Bargaining Agreement. It was presented to plaintiff's foreman who responded, "There has been no violation of the Agreement. Grievance Denied."

Plaintiff was directed to withdraw the grievance and when he failed to do so was thereupon suspended. The "Group Grievance" was subsequently withdrawn and a document entitled "Employee Grievance (Ex. D) was substituted and presented by management. This document was dated June 12, 1970. Plaintiff's suspension continued until the "Group Grievance" was withdrawn. His total period of suspension was the balance of shift on June 8, 1970, plus June 9 and June 10, 1970.

Defendant, through its management, responded by denying that the document was a grievance filed under the grievance procedure and had no standing. Management also instructed plaintiff that the subject matter was not a grievable subject. An examination of the Collective Bargaining Agreement (Defendant's Ex. J, paragraph 4(a) and paragraph 55(a), subparagraph (3)), indicates that matters such as racial discrimination or personal prejudice are grievable and may be processed through

the grievance procedure. The action of management in June of 1970 was a violation of the Collective Bargaining Agreement and an act of discrimination against the plaintiff.

8. Plaintiff's ultimate separation from defendant's employment occurred after plaintiff received all rights accruing to him under the Collective Bargaining Agreement and the supplemental agreement covering insurance programs (Ex. A–O) and did not constitute an act of racial discrimination nor an act of retaliation for past conduct.

9. There is a definable class of persons for whom this action may be maintained. Such class consists of those black employees of defendant who during the period from July 2, 1965 (effective date of Title VII of the Civil Rights Act of 1964), to September 1, 1971 (approximate beginning date of STEAM program) were denied an opportunity for promotion to supervisory positions although possessing seniority and qualifications equivalent to white employees who were so promoted.

The foregoing class is so numerous that joinder of all members is impracticable. There are questions of law or fact common to such class and the claims of plaintiff are typical of the claims of such class.

The evidence presented has demonstrated that the questions of law or fact common to the members of the foregoing class predominate over any question affecting only individual members and a disposition on behalf of a class is superior to other available methods for the fair and efficient adjudication of the matters in controversy.

II

OPINION

A consideration of plaintiff's claim must logically be divided into two parts: First, a consideration of plaintiff's own

rights; and second, his position as a representative of a class claiming racial discrimination in promotional opportunities. The various disciplinary actions taken against plaintiff with the exception of that of June, 1970, appear to lack aspects of racial discrimination. It is quite apparent that plaintiff took his perceived duties as an Alternate Committeeman quite seriously and in confrontations with supervisory employees, conducted himself with substantially less tact and diplomacy than probably was warranted. Labor relations, however, between union representatives and first level supervision do not always achieve the finesse and subtlety of parliamentary debates. The participants are frequently angry, harassed, and contentious. Raised voices, abusive language, and personal threats are not unknown. Despite the restrained description of these events related in the solemnity of a United States District Courtroom, one reaches the inevitable conclusion that the confrontation was not carried out in a manner that promoted "peaceful and satisfactory adjustments by sincere and patient effort on both sides." [2] While there was always a potential undertone of discrimination in the 1971 confrontations between plaintiff and white foremen, there is insufficient evidence from which the Court can conclude that the punishment meted out to plaintiff was occasioned by discrimination or by his activities in behalf of black employees. The incidents additionally are not significant to this matter since they were properly handled by arbitration, with rulings by impartial umpires, and the matters would appear to be closed.

The incident of June, 1970, does not lend itself equally to similar disposition. While it is quite true that plaintiff obtained a grievance form because of his position as an Alternate Committeeman, and while it is likewise true that plaintiff proceeded with a "grievance" in a fashion not contemplated by the griev-

2. Introduction—Agreement between Inland Mfg. Division of General Motors Corporation and Local Union 87, United Rubber, Cork, Linoleum & Plastic Workers of America (Joint Ex. II).

ance procedure, the conduct of management was substantially less than understanding. Its concern for "form" totally ignored the substance of plaintiff's complaint and in so doing subverted the essential purpose of grievance procedures. Plaintiff's testimony that he was induced to withdraw Exhibit E entitled "Grievance," and substitute the same item on a blank piece of paper has not been controverted.

Perhaps no specific representation was made but there is evidence to find that plaintiff was induced to proceed in this fashion on the assumption that his grievance would receive attention. In fact, it did not; it was subjected to the most perfunctory consideration and a disposition which was surely not in keeping with the spirit of a collective bargaining agreement and, as a matter of fact, not even proper in terms of the bargaining agreement in question. Defendants have asserted that the plaintiff was not disciplined for presenting a grievance but was disciplined for refusing to withdraw it. Defendant likewise asserts that its response, "in any event the subject matter raised is not a grievable subject," was misinterpreted and really meant something else.[3] Neither witnesses nor counsel have been able to suggest to the Court what that something else may have been. Management's attitude must have had a predictable effect upon other black employees who were also concerned over acts of discrimination in promotion.

The observable net result of plaintiff's assertion of a grievance on behalf of black employees was a disciplinary suspension. This is a classic example of a "chilling effect" upon the assertion of rights by black employees. Plaintiff, who had the temerity to raise a question uppermost in all black employees' minds, was met not with understanding and not with tolerance, but with a punishment and an unresponsive incorrect assertion that "the subject is not grievable."

It must be noted that defendant has since made a valiant and determined effort to correct this situation. Defendant has been involved in programs in predominately black high schools in the Dayton area, has worked with boys' clubs, established programs for the recruiting of college graduates at predominately black colleges, assisted in the development of a chemical engineering program at Hampton Institute, established co-op programs, tuition refund

3. THE COURT: Yes, let me state in this fashion: Are you saying that this company could adopt a policy that we will not promote blacks to supervisory positions period. Now, aside and apart from any violations of Title VII, are you saying that under this contract they could so do and that that would not be grievable?

MR. PFARRER: No, Your Honor, I would not say it would not be grievable because of the fact that the whole concept of this Collective Bargaining Agreement; that is, the whole contract is to be administered and employees are to be treated equally without regard to color, sex or national origin.

THE COURT: Precisely, and if an employee asserts that has been done, he may or not prevail, but it is a grievable subject.

MR. PFAFFER: Yes, Your Honor.

THE COURT: Okay. Mr. McDonald has said it is not a grievable subject.

MR. PFARRER: Your Honor, every craft, every profession has words of what shall I say are peculiar to that craft or that profession, and I assume what Mr. McDonald was using was the nomenclature which is peculiar to the group which has to do with labor relations, and as you know, Your Honor, the Courts have held that that becomes the common law of the plant in which the people are working, and the plant where the contract is in existence. Now, I am assuming Mr. McDonald in his action persisted in using a phrase in replying that was the common law of Inland Manufacturing Division as regards labor and management. Now, that I don't understand it entirely is of no importance. If the parties understand; that is, the representatives of the employees through their Union and a representative of management through his duly designated officials—

THE COURT: Mr. Pfarrer, what are you saying the common law's meaning of that phrase "it is not a grievable subject" is?

MR. PFARRER: Your Honor, I cannot answer that question. I will have to study it. I will have to be informed. I will have to be, in a word, educated.

R., pp. 437, 439

programs, and completely revised its foreman selection procedure by the inception of the STEAM program. As of this date, it is clear that defendant meets its responsibilities towards minority employees as one would expect a progressive corporation such as General Motors to do. The testimony regarding the STEAM program is impressive indeed. But its very success emphasizes the failure of defendant prior to the date of its inception. The most convincing evidence presented to the Court of promotional discrimination by defendant is the STEAM program. The dramatic increase between the year 1971 and 1972 of black supervisory employees is both a testament to the efficacy of the STEAM program and the validity of plaintiff's position. The dramatic rise in black foremen noted in Finding of Fact 5 alone leads inescapably to the conclusion that lacking a program such as STEAM, black foremen simply would not be selected.

A view of the exhibits in this regard from 1966 to 1973 shows an increase from less than 1% black foremen to almost 9% black foremen. No evidence has been presented by defendant that blacks were less qualified prior to 1971 or that any presently promoted are unqualified. Rather, we must conclude that black foremen prior to 1971 were not selected and would not be selected so long as the initiating process remained in the hands of informal and unspecified management selection processes. This method of foreman selection was considered and held discriminatory in Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir. 1972). This Court can add nothing to Chief Judge John R. Brown's eloquent conclusion:

"The methods for promotion . . . would enable an individual foreman, if he were so inclined, to exercise racial discrimination in his selection of candidates for promotion . . . and that, under the social structure of the times and place, Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion . . . procedures which depend almost entirely upon the subjective evaluation and the favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. *We and others have expressed the scepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action."* [emphasis added]

Courts have often observed that proof of overt racial discrimination in employment is seldom direct. United States v. Jacksonville Terminal Company, 451 F.2d 418 (5th Cir. 1971); Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157 (8th Cir. 1971). It is well established that courts must also examine statistics, patterns, practices and general policies to ascertain whether racial discrimination exists. Graniteville Company v. EEOC, 438 F.2d 32 (4th Cir. 1971); Parham v. Southwestern Bell Telephone Company, 433 F.2d 421 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. den. 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; United States v. Hayes International Corporation, 415 F.2d 1038 (5th Cir. 1969). (The foregoing was cited and followed in Brown v. Gaston County Die and Machine Company, 457 F.2d 1377 (4th Cir. 1972).

Based upon the evidence and upon the teachings of the cited cases, we find that this defendant did discriminate from the period of July 2, 1965, to September 1, 1971, against its black employees in the selection of supervisory personnel. While defendant's efforts did terminate such discrimination on or about September 1, 1971, those efforts are not dispositive of the prior discriminatory activities. Under similar circumstances the United States Court of Ap-

peals for the Sixth Circuit has held that upon a finding of discrimination, back pay should be awarded to those who have sustained damages as a result of discrimination.

The finding of discrimination by the district court, in addition to the nature of the relief [compensatory as opposed to punitive], and the clear intent of Congress that the grant of authority under Title VII should be broadly read and applied mandate an award of back pay unless exceptional circumstances are present. Head v. Timken Roller Bearing, 486 F.2d 870 (6th Cir. 1973). In accord, Bowe v. Colgate Palmolive Company, 416 F.2d 711 (7th Cir. 1969); Robinson v. Lorillard Corporation, 444 F.2d 791 (4th Cir.), cert. den. 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Rowe v. General Motors Corporation, *supra*.

The award of back pay, the formula of computation and the determination of recipients are matters for determination by this Court and will be dealt with in a subsequent order. Thornton v. East Texas Motor Freight, 497 F.2d 416 (6th Cir. 1974).

### III

### CONCLUSIONS OF LAW

(A) This court has jurisdiction of the matter at hand in accordance with 42 U.S.C. § 2000e–5(f)(3). Plaintiff has invoked the equity jurisdiction of this court pursuant to Title VII of the Civil Rights Act of 1964. All steps required by 42 U.S.C. § 2000e were taken by the plaintiff prior to the filing of this suit and the matter is properly before the Court for final disposition.

(B) Prior to September 1, 1971, defendant, in violation of 42 U.S.C. § 2000e–2, discriminated against individuals with respect to compensation, terms, conditions or privileges of employment because of such individual's race or color by denying such persons an equal and nondiscriminatory opportunity to qualify for promotions.

(C) Plaintiff has established by a preponderance of the evidence that disciplinary action taken against him by defendant on June 8, 1970, was in retaliation for plaintiff's efforts to present a grievable issue of racial discrimination in accordance with the Collective Bargaining Agreement then in effect. For such discriminatory act, plaintiff is entitled to recover the sum of One Thousand Dollars ($1,000.00) from defendant.

(D) Plaintiff has failed to establish by a preponderance of the evidence that disciplinary action taken against him by defendant in January, 1971 and December, 1971, were retaliatory in nature or acts of racial discrimination.

(E) This matter qualifies for and is maintainable by plaintiff as a class action in accordance with Rule 23 of the Federal Rules of Civil Procedure.

(F) Having found that defendant has intentionally engaged in an unlawful employment practice as charged in the complaint, such defendant is hereby enjoined from engaging in any future promotional practice which has the effect of discriminating against employees by reason of race or color.

(G) Determination of the damages sustained by independent members of a class involves difficult computations and should be referred to a Master in accordance with Rule 53 of the Federal Rules of Civil Procedure.

Let judgment issue in accordance with the foregoing.

### ORDER

This matter is before the Court in accordance with the findings of fact, opinion and conclusions of law issued on September 10, 1974. There remains in the foregoing case both a determination of specific individuals constituting a class and the amount of specific damages each has sustained. Such determinations involve difficult computation of damages and require reference to a Master in accordance with Rule 53(b) of the Federal Rules of Civil Procedure.

Harold Korbee, Esq., of Cincinnati, Ohio, is hereby designated Master in accordance with Rule 53(c) to accomplish the following determinations:

1. In accordance with Finding of Fact 9, such Master shall determine the specific persons who are members of the class. Each member shall meet the following conditions:

   (a) Employment by Inland Division of General Motors Corporation for some period between July 2, 1965, and September 1, 1972;

   (b) Achievement of seniority equal to the average minimum seniority required for promotion to supervisory positions during a given year;

   (c) No objective disqualifications which would enable the defendant to refuse promotion to an employee otherwise qualified as a member of the class;

   (d) Identification as a black production employee.

2. The class shall be divided into seven subclasses as follows:

   Subclass A: Those employees meeting the conditions of paragraph 1 herein between July 2, 1965 and December 31, 1965;

   Subclass B: Those employees meeting the conditions of paragraph 1 herein between January 1, 1966 and December 31, 1966;

   Subclass C: Those employees meeting the conditions of paragraph 1 herein between January 1, 1967 and December 31, 1967;

   Subclass D: Those employees meeting the conditions of paragraph 1 herein between January 1, 1968 and December 31, 1968;

   Subclass E: Those employees meeting the conditions of paragraph 1 herein between January 1, 1969 and December 31, 1969;

   Subclass F: Those persons meeting the conditions of paragraph 1 herein between January 1, 1970 and December 31, 1970;

   Subclass G: Those employees meeting the conditions of paragraph 1 herein between January 1, 1971 and September 1, 1971.

   Membership in each subclass shall be limited to those employees meeting the conditions of paragraph 1 for more than one-half of the period covered by such subclass.

3. A fund of money shall be created for each subclass equivalent to the difference in pay between a supervisory and nonsupervisory employee multiplied by the number of supervisory positions available in a nondiscriminatory situation to black employees. It will be assumed for purposes of this reference that in a situation devoid of discriminatory promotion, black employees would receive that number of promotions which corresponds to their percentage of the total production force. Such sum of money shall be divided among the affected subclass members equally.

4. An employee shall cease to be a member of any subclass on the date he was discharged, laid off, promoted to a supervisory position, or refused such promotion.

5. The foregoing shall be subject to change as to any employee where adherence thereto would create a manifest injustice.

6. The award of back pay shall be compensatory in nature and shall not exceed the difference between the pay received by supervisory employees and that actually received by the employee in question between the dates above mentioned.

In the disposition of this matter the Master shall have without limitation the powers set forth in paragraph (c) of said Rule 53. In accordance therewith

the Master shall hold hearings, take testimony, receive evidence and make prompt disposition by report to this Court.

The Master shall be compensated in such an amount as is agreeable to the parties and to said Master. He shall likewise receive the necessary and usual out-of-pocket expenses. In the event of disagreement between the parties, the Court will fix the Master's fee.

In accordance with 42 U.S.C. § 2000e–5(k), reasonable attorney fees will be awarded for all services rendered by counsel for the plaintiff. The Master is directed to make a determination and report to the Court the amount of reasonable attorney fees to be awarded to the attorney for the plaintiff for those services rendered in proceedings before the Master.

It is so ordered.