## Case No. 17,008.

VOSE v. INTERNAL IMPROVEMENT FUND.

[2 Woods, 647.] [1]

Circuit Court, N. D. Florida. May, 1875.

CONTEMPT — DISOBEDIENCE OF INJUNCTION — REHEARINGS — CONSENT DECREES — AUTHORITY OF ATTORNEY — EQUITY JURISDICTION—TRUSTS OF PUBLIC LANDS.

1. Where the trustees of the internal improvement fund of Florida were restrained by the order of the court from selling or disposing of any lands belonging to their trust, except in strict accordance with the act of the legislature prescribing their duties, and the exercise of judgment and discretion was required on the part of the trustees as to the true construction of their powers and duties under the act, and they answered under oath that they had done no act which they believed or supposed was in violation of any direction of the court, but had in good faith tried to obey the decree of the court, a motion to attach them, as for a contempt for disobedience of the decree of the court, was overruled.
[Cited in Re Cary, 10 Fed. 626.]

2. Neither a petition, nor an order of the court, for a rehearing, of itself stops proceedings under the decree, unless the court so specifically directs.

3. An attorney for trustees charged with a public trust, or one of such trustees acting as attorney for the others, has not the implied power to consent to a decree which has the effect of taking the trust out of the hands of the trustees, or of placing the execution of it, in whole or in part, in other hands.

4. Lands belonging to the public domain of a state which, by an act of the legislature, had been made a trust estate for the payment of certain bonds, and placed under the control of trustees appointed by law, were subject to the power of a court of equity to raise therefrom the money due and chargeable thereon, and the court could appoint its own agents to make sales thereof.
[Cited in Chaffraix v. Board of Liquidation, 11 Fed. 644.]

5. In such a case, the court has the power to compel the trustees who hold the legal title to execute conveyances for the lands sold by the agents of the court.

1 [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

In equity. On the 6th day of January, 1855, the legislature of Florida, by an act of that date, vested certain public lands, including all swamp and overflowed lands belonging to the state, in the governor, comptroller, treasurer, attorney general and register, as trustees, to constitute an internal improvement fund, and to serve amongst other things as a guaranty of bonds to be issued by certain designated railroad companies for the purchase of iron rails and rolling stock. A certificate of guaranty was to be placed on the bonds of the trustees. In case the interest on these bonds, and one per cent. per annum for a sinking fund, were not paid by any of the companies, the trustees were authorized to take possession of and sell the road, the appurtenances and franchises of the company in default, and to apply the proceeds in purchasing the bonds issued by the company, or incorporating them with the sinking fund. The powers of the trustees were large and various. They were authorized to fix the prices of the lands, to make arrangements for draining them and to promote their settlement and cultivation by allowing preëmptions and other modes of encouragement. The Florida Railroad Company was one of the companies included in the benefits of this act, and issued a large number of bonds, which were duly indorsed by the trustees. No installments of interest or sinking fund were paid during the war. In November, 1866, the trustees seized and sold the road, and, with the proceeds of sale, purchased and canceled a large proportion of the outstanding guarantied bonds of the company. The complainant [Francis Vose] held a number of the bonds of the company which were not thus purchased. He filed his bill for relief against the trustees whom he charged with mismanagement of the trust funds, and against other parties and corporations whom he charged with complicity in such mismanagement by obtaining fraudulent purchases of the lands at nominal prices. He also prayed for an injunction and for the appointment of a receiver of the trust fund. [See Cases Nos. 17,007 and 17,011.] The court granted first an injunction, afterwards it appointed a receiver, and at a still later date it appointed three persons to act as agents for the trustees. The order of the court, allowing the injunction and making the appointments just stated, is fully set out in the opinion of the court which follows. The case came on for hearing on a motion to attach the trustees for disobeying the injunction of the court, and also upon a petition for a rehearing of the order of the court appointing the said agents of the trustees.

Henry R. Jackson and David S. Walker, for complainant.

Wm. Archer Cocke, Atty. Gen. Fla., and James M. Baker, for defendant.

BRADLEY, Circuit Justice. The first motion in this case is made by the complainant, for an attachment against the individual trustees of the internal improvement fund, as for

a contempt, which motion is based upon the charge that said trustees have violated the injunctions and decrees heretofore made in the cause. The defendants (the trustees aforesaid) have answered the petition for an attachment, distinctly and positively denying any intention to violate any injunction or decree in the cause, and averring that they have not done so, but that, whatever their predecessors may have done, they, the present trustees, have been guided by the opinion of their counsel, with a firm endeavor to comply with every injunction decree and order binding on them. This is the substance and effect of their several answers—not the precise terms in which they are couched. But the complainant, in rebuttal of these answers, relies on certain undisputed facts, which he alleges to be clear violations of the injunctions on the part of the defendants.

The injunctions which the trustees are charged with violating are based on several orders of the court heretofore made. The first was issued by Circuit Judge Woods on the 6th of December, 1870, among other things, enjoining the then trustees and their successors from selling or donating or disposing of the land belonging to the trust, otherwise than in strict accordance with the provisions of the act of 1855, fixing the price and allowing pre-emptions of the same in obedience to all the restrictions of the act; that they desist from selling said lands for scrip or state warrants of any kind, or for aught else than current money of the United States; that they desist from using or applying any of the moneys of the fund, except in applying them to the creation of the sinking fund under the act, or in payment of coupons, according as they properly belong to the one purpose or the other; and that they desist from paying the coupons in any other mode than in the order of their priority, fixed by the date of their coming to maturity, paying first such as first became due, and the others in the order in which they fell due; and that they desist from carrying out a certain agreement made with the Florida Improvement Company for the sale of one million one hundred thousand acres of land at ten cents an acre.

The second order relied on was made by District Judge Frazer on the 1st of June, 1872, whereby a receiver was appointed to receive and hold all the moneys and securities belonging to the trust fund, and these trustees were required to pay to the said receiver all moneys in their possession or control, and to deliver to him all securities or evidences of indebtedness belonging to said fund, and to pay to him, from time to time, all moneys which might come into their hands from the sale of land or any other source whatsoever.

The third order or decree relied on is the decree made by Circuit Judge Woods, December 4, 1873, which authorized Marcellus A. Williams, Samuel A. Swan and Hugh A. Corley, the agents of the trustees for the sale of the lands of the internal improvement fund, to sell said lands in such amounts and at such prices as would, in the exercise of their discretion, most rapidly procure the requisite means to discharge the indebtedness established by decree in the cause, and make the said agents responsible for all their acts in the exercise of this discretionary power, not simply to the trustees, but directly to the court, subject to injunction at any time by its order, and liable to punishment for contempt; and required the said agents to pay over to the trustees the money that might be received by them from sales, and to report the same to the receiver; and requiring the trustees to turn over the said moneys to said receiver monthly, with a monthly statement of account; the trustees to arrest the proceedings of the agents if, in their judgment, they were so exercising the powers vested in them as to jeopardize the interests of the state in the fund; it was also provided that all legitimate expenditures and compensation for services should be deducted by the agents from the moneys coming into their hands; and, in like manner, that all legitimate expenditures be retained by the trustees, before turning over the same to the receiver, subject, however, to exception and the approval of the court.

From this recital of the original injunction and the subsequent orders and decrees, it is apparent that it is somewhat difficult to define, except in a few specified particulars, what are the positive prohibitions imposed upon the trustees. That they are not to receive scrip or state warrants, or anything else than current money for the price of lands sold; that they are to apply the moneys of the fund only in aid of the sinking fund and payment of coupons; that they are to pay coupons only, according to priority of maturity; and that they must pay to the receiver all moneys coming into their hands, after deducting necessary expenses, are directions sufficiently specific and clear; and these directions they insist that they have ever observed since their accession to the offices which they respectively hold. But the injunction not to sell or dispose of any lands belonging to the trust, otherwise than in strict accordance with the provisions of the act of 1855, is one which, in its very terms, involves the exercise of some judgment and discretion on the part of the trustees as to the true construction of their powers and duties under the act; and the implied duties which arise from the peculiar relation which they hold to the agents appointed to make sales of land are so inferential and uncertain that it is very difficult to designate any act or omission, which has been charged against them, as a violation of an order of the court.

It is charged that, in reference to the last decree, they have pursued an obstructive policy; first, in discharging the agents, as their agents, after they had been appointed agents by the court; second, in refusing to make deeds for lands sold by the agents; and, third, in refusing to give the agents scrip for small parcels of land called "floats," although they contracted

with other parties to give them such scrip. But it is just to say, that no injunction or decretal order has ever been made prohibiting them from discharging their agents, or requiring them to do either of the other things specified. It may be implied that it was expected of them that they should give deeds for lands sold by the agents; out no such order has ever been made. And, on their part, they give their reasons for not giving such deeds; they did not approve the sales made by the agents. If it be alleged that no right of approval or disapproval was reserved to them, it may very plausibly be said that their control and supervision over the acts of the agents were expressly confirmed by the decree itself in the clause which authorized them to arrest the proceedings of the agents, if in their judgment they were so exercising their powers as to jeopardize the interests of the state in the fund. As the greater power usually includes the less, they contend that it was reasonable for them to suppose that they had the lesser power, which they had always exercised, of judging of the expediency of particular sales and contracts for sale. As the trustees expressly swear that they have not done anything in the matters complained of which they believed or supposed was violative of any direction of the court, but were ever solicitous of carrying out the object which the court, by its decrees, had in view, namely, the raising of money by sales of land to pay off and discharge the indebtedness of the fund, and have desired and now desire to comply with the directions of the court. we do not feel called upon to adjudge them in contempt upon the vague charge of pursuing an obstructive policy.

It is further charged, however, that they have committed certain specific acts, which amount to a contempt. These acts may be arranged in two classes: First, making contracts for large sales of land at inadequate prices and not according to a scale of fixed prices as required by the act of 1855; secondly, paying moneys out for purposes contrary to those expressed in the original injunction. As to the first of these charges, it does appear that the trustees have made a contract with the Great Southern Railroad Company for a large sale of land, involving millions of acres. which would be void according to the decision of the supreme court of Florida, in the case of Trustees v. Bailey, 10 Fla.. 112. By the decision in that case, neither they nor the legislature itself have the right to appropriate any part of the internal improvement fund to the promotion of any other schemes of internal improvement than those mentioned in the act of 1855, until the bonds issued to carry out the system therein mentioned have been paid, or placed on a safe basis of payment, as prescribed by the act. The trustees say that the benefits to be derived from the construction of the proposed railroad will more than compensate for the low and merely nominal price at which they are to have alternate sections of land. But, according to the doctrine of that case. this makes no difference; they are not to be the judges; the existing debts must be first paid before new ones can be created. If this view should be adopted by this court, it may be good cause for setting aside the said contract; but as the trustees allege that they have acted in good faith, and with a view to the best interests of state, and of the internal improvement fund itself, we do not think that they can be convicted of a contempt of this court. The court has never made any order depriving the trustees of the power to sell and dispose of the lands, but only enjoining them to sell in accordance with the terms and provisions of the act of 1855. But the act gives them large discretion, and authorizes them to have in view the encouragement of immigration, the drainage of swamp land and the development of the resources of the state. If the contracts already made with the holders of existing outstanding bonds are such as to preclude the trustees from exercising this discretion in all its original largeness, there is still sufficient room for difference of opinion as to the extent of their remaining discretion, to divest their acts of the character of contempts of court, until the court shall have explicitly declared what they shall or shall not do. The other contracts referred to do not admit of as much question as the one which we have considered; and we do not think, therefore, that any attachment for contempt should issue for this cause. As to the payments which the trustees have made for expenses and services of agents, salesmen, counsel, etc., their accounts are rendered monthly, according to a former decree, and are always subject to examination and exception, and may be allowed or disallowed by the court. The trustees contend that the expenses are all proper to be made, and there is no charge that they have not been actually made. They present no ground for attachment as for a contempt. The motion for attachment must be overruled.

We next come to the motion by the trustees for a rehearing, upon a petition filed by them on the 12th day of January, 1874, during the term at which the decree of December 4, 1873, which they desire to be reheard, was made. It sufficiently appears that the petition was filed in due time, and properly signed by counsel, and that no opportunity has since occurred for arguing the motion for rehearing. It is, therefore, in order to be heard at this time.

The defendants insist that the petition itself, proprio vigore, suspended all proceedings on the decree. But this is not the law. Expressly the contrary is laid down in Daniell. Ch. Prac., and other books. Daniell says: "It is an established rule that an order for a rehearing, or an appeal, does not stop the proceedings under the decree or order appealed from, without special order of the court." 2 Daniell, Ch. Prac. (3d Am. Ed.) 1547. Hoffman says: "Neither the petition for rehearing, nor the order itself, stops the proceedings under a decree. A special order must be obtained on application." 1 Hoff. Ch. Prac. 565, note. On the other hand, the complainant insists that the decree was a consent decree, and a rehearing cannot

be had thereon. The trustees, as soon as they heard of the decree, repudiated the authority of their attorney (Hon. W. A. Cocke), to enter into such a consent. It is insisted, however, that he, himself, being attorney general of the state, was one of the board of trustees, and occupying that position, had more than the usual authority of an employed attorney. We have great hesitation in acceding to the proposition that an attorney, or that one of several trustees, acting as such, has implied power in any case to consent to a decree which has the effect of taking the trust out of the hands of the trustees, or of placing the execution of it, in whole or in part, in other hands. And in the case of a public trust, like the one in question, the reasons for hesitation are still stronger. After due consideration of the subject, we are of opinion, that no such implied power exists; and therefore, without at present going into the reasons for our conclusion, we adjudge and decide that the decree, in this case, is open for consideration.

The grounds alleged for a rehearing are mainly that the trustees are statutory trustees, ex officio, appointed by the law, and clothed with many duties of a public and political character; and that the appointment of other persons to execute said trusts is incompatible with the duties to be performed; and, secondly, that private persons cannot be appointed by the court to make judicial sales of land.

In answer to the first of these objections, it may be said that the agents appointed by the court to make sales of land were not invested with the general trusts imposed by the statute on the ex officio trustees; but only with the power to sell lands for the purpose of raising the moneys due to the parties decreed to have claims against the same. If the lands belonging to the internal improvement fund may be at all subjected to the payment of the bonds secured thereby; if they are in truth a trust fund, inter alia, for the payment of those bonds, they are subject to the power of a court of equity to raise therefrom the money due and chargeable thereon. The question then arises, How shall the court effect their sale for the purpose? Can it only require the trustees to make sales, or may it effect the sales by other agencies? Suppose the trustees refuse to act, is the court without power to authorize a sale by other modes? It seems to us clear, that the court may employ its own accustomed machinery for the purpose of raising the money to satisfy the liens on the fund. And we are of opinion that a court of equity may appoint commissioners, receivers, or special masters or agents, in its discretion, to effect such sales. In our judgment, therefore, the appointment of the agents in question was neither illegal nor erroneous. The difficulty arises from the want of power in the agents to give good conveyances for the lands sold. But the court certainly has power to compel those who hold the legal estate to execute the proper conveyances. The trustees can be ordered to execute the necessary deeds. But as this is not an ordinary case, as great interests are affected, as the position of the trust is peculiar, and connected with the general interests of the state, and as the trustees are public functionaries, presumably interested with the duties imposed upon them for public and politic reasons, we do not feel disposed to adopt such a course as might be admissible in an ordinary case of private trust.

Upon consideration of the matter, we have come to the conclusion that whenever the agents for making sales shall have effected a sale, for which the trustees shall refuse to execute proper conveyances, they shall report the same to the court, and if the same shall be approved by the court after the trustees have had due opportunity to be heard, an order to the effect shall be made, and the trustees will be directed to execute the proper deeds. The case is a difficult one at best. It would be an absurdity to attempt to make a forced sale of such immense territories as might be required, at once, to raise the amount of moneys due, especially at this time of unusual financial depression. We feel bound to use a wise discretion in this matter, and whilst we feel bound to assist the bondholders in every practicable way to realize their arrears of interest in the shortest feasible time, we cannot entirely overlook the large interests which may be sacrificed by hasty and precipitate action.

An order will be made in conformity with the views now expressed, namely, that hereafter, in case the said agents for sale shall report any sales by them effected to the trustees, and the latter shall refuse to execute the necessary deeds therefor, the agents shall report the same to the court, which will hear the matters, and if the negotiation be approved, will confirm the sale, and direct conveyances to be made.

The complainant's counsel has applied for an order to pay out and distribute the money now accumulated in the receiver's hands. We see no objection to paying those who have registered their coupons according to the previous orders of the court, retaining the share of those whose coupons have not yet been properly verified, or have been rejected by the master, until further order. Ordered accordingly.