In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-12344

_____

CHARLES T. JOHNSON,
on behalf of himself and others
similarly situated,

Plaintiff-Appellee,

JENNA DICKENSON,

Interested Party-Appellant,

*versus*

NPAS SOLUTIONS, LLC,

Defendant-Appellee.

_____

2                                                                    18-12344

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:17-cv-80393-RLR

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN,
ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK,
LAGOA, and BRASHER, Circuit Judges.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, it is ORDERED that this case will not be reheard en banc.

18-12344                NEWSOM, J., Concurring                1

NEWSOM, Circuit Judge, concurring in the denial of rehearing en banc:

It has become customary for the author of a panel opinion to file a "concurral" defending his or her handiwork against a colleague's "dissental" when the full Court declines to rehear a case en banc. Ordinarily, I'd be inclined to do just that. (Perhaps it's a character flaw, but giving others the last word isn't always my strong suit. *See, e.g.*, *Keohane v. Florida Dep't of Corr. Sec'y*, 981 F.3d 994, 996–1003 (11th Cir. 2020).) This case, though, has been pending too long already. The panel issued its decision in September 2020—almost two full years ago now. The parties and the bar are entitled to closure. Given the circumstances, I'm content to let the panel opinion speak for itself.

18-12344                JILL PRYOR, J., Dissenting                1

JILL PRYOR, Circuit Judge, joined by WILSON, JORDAN, and ROSENBAUM, Circuit Judges, dissenting from the denial of rehearing en banc:

In the panel decision in this case, the majority held that two Supreme Court cases decided in the 1880s prohibit district courts from approving, under any circumstances, incentive or service awards for class representatives in class action settlement agreements. See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1255 (11th Cir. 2020). According to the majority opinion, these two cases dictate that such awards—despite the parties having agreed to them and district courts having approved them as reasonable and fair to the entire class under Federal Rule of Civil Procedure 23—are simply barred. See Trustees v. Greenough, 105 U.S. 527 (1881); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885).

By holding that incentive awards are unlawful per se, the majority opinion broke with decisions from this and every other circuit allowing these awards when properly approved under the strictures of Rule 23. Indeed, the majority opinion adopted a position that had never been embraced by any court. Of course, the mere fact that an argument has never been accepted before does not mean it is wrong. One circuit has expressly rejected the novel Greenough-Pettus argument, however,[1] and since the majority opinion in this case issued, every court outside this circuit to have

---

[1] Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 96 (2d Cir. 2019).

2                    JILL PRYOR, J., Dissenting                    18-12344

considered it has declined to follow it.[2] And no wonder. In *Green-ough* and *Pettus*, decided long before modern class actions were born, the Supreme Court applied equitable trust principles in the absence of any authority for compensating creditors who through litigation benefitted a common fund. Operating in that now-super-seded legal landscape, the Court rejected compensation for a cred-itor's expenses that were—as the panel majority opinion candidly acknowledged—only "roughly analogous" to today's incentive awards approved under Rule 23. *Johnson*, 975 F.3d at 1257. So it seems to me more than a stretch to hold that these cases prohibit

---

[2] *See Knox v. John Varvatos Enters. Inc.,* 520 F. Supp. 3d 331, 349 (S.D.N.Y. 2021); *Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 353–54 (D.N.J. 2020); *Halcom v. Genworth Life Ins. Co.*, No. 3:21-cv-19, 2022 WL 2317435, at *10, *13 (E.D. Va. June 28, 2022); *Grace v. Apple, Inc.*, No. 17-cv-00551, 2021 WL 1222193, at *7 (N.D. Cal. Mar. 31, 2021); *In re Apple Inc. Device Perfor-mance Litig.*, No. 5:18-md-02827, 2021 WL 1022866, at *11 (N.D. Cal. Mar. 17, 2021); *Wickens v. Thyssenkrupp Crankshaft Co., LLC*, No. 1:19-cv-6100, 2021 WL 267852, at *2 (N.D. Ill. Jan 26, 2021); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *3–4 (W.D. Mo. Jan. 25, 2021); *Wood v. Saroj & Manju Invs. Phila. LLC*, No. 19-cv-2820, 2020 WL 7711409, at *5 n.8 (E.D. Penn. Dec. 28, 2020); *Izor v. Abacus Data Sys., Inc.*, No. 19-cv-01057, 2020 WL 12597674, at *8 (N.D. Cal. Dec. 21, 2020); *Hunter v. CC Gaming, LLC*, No. 19-cv-01979, 2020 WL 13444208, at *7–8 (D. Colo. Dec. 16, 2020); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420, 2020 WL 7264559, at *24 n.24 (N.D. Cal. Dec. 10, 2020)*; see also Hart v. BHH, LLC*, No. 15-cv-4804, 2020 WL 5645984, at *5 n.2 (S.D.N.Y. Sept. 22, 2020) (noting that Second Circuit precedent prevented the court from following *Johnson* but calling on Congress to address the validity of incentive awards).

18-12344              JILL PRYOR, J., Dissenting              3

incentive awards in all cases, no matter that the parties and the district court agree the awards are fair and appropriate.

I agree with Judge Martin's well-reasoned dissent to the panel opinion that the majority was wrong. The fairness-based standard for evaluating disparate settlement distributions between representative plaintiffs and class members set forth in *Holmes v. Continental Can Company*, 706 F.2d 1144 (11th Cir. 1983), which panels of this court have continually applied in reviewing class action settlements, does not conflict with Supreme Court precedent and should continue to govern our analysis of incentive awards authorized by class action settlement agreements. *See Johnson*, 975 F.3d at 1264 (Martin, J., concurring in part and dissenting in part).

The stakes are high. If the panel majority opinion was wrong that *Greenough* and *Pettus* compel its holding, then it far overreached by banning all incentive awards in class actions. As it stands, the panel majority's opinion threatens the very viability of class actions in this circuit. This is particularly so in small-dollar-value class actions, where incentive awards help to encourage potential plaintiffs to serve as class representatives despite having to take on significant additional responsibilities while receiving the same modest recovery as other class members. I respectfully dissent from the denial of rehearing en banc to correct the panel majority opinion's grave error.

4                    JILL PRYOR, J., Dissenting                    18-12344

## I.      BACKGROUND

NPAS Solutions, a company that collects medical debts, repeatedly robocalled[3] Charles Johnson on his cell phone, trying to collect a debt. Unfortunately, NPAS was trying to collect the debt from a person Mr. Johnson did not know. Again and again, Mr. Johnson informed NPAS that it was calling the wrong number and asked it to stop calling. Yet NPAS persisted with its collection calls.

Fed up, Mr. Johnson took the initiative to sue the company, on behalf of himself and a putative class of similarly situated individuals, alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Mr. Johnson hired legal counsel with significant experience in TCPA class action litigation to investigate his and the other class members' claims.  No one disputes that after initiating the suit, Mr. Johnson was "actively involved in [the] case throughout the proceedings." Doc. 44-1 at 14.[4] For example, he spoke frequently with his attorneys, read and approved documents before his attorneys filed them, and supplied information in response to NPAS's discovery requests.

NPAS agreed to settle the claims with Mr. Johnson and the putative class. The settlement agreement required NPAS to pay $1.432 million into a settlement fund to compensate participating

---

[3] "Robocalling" means calling using an automatic dialing system and an artificial prerecorded voice.

[4] "Doc." numbers refer to the district court's docket entries.

18-12344            JILL PRYOR, J., Dissenting              5

class members. Under the terms of the agreement, Mr. Johnson would receive $6,000 from the fund for serving as class representative. The remainder of the fund—the other 99.58 percent—minus the plaintiffs' attorney's fees and costs, would be distributed equally among the participating class members. The parties submitted the proposed settlement agreement to the district court for preliminary approval under Rule 23, and the court gave its approval. At the same time, the district court set a deadline for any class member to file a claim for recovery or object to the settlement agreement.

More than 9,500 class members submitted claims for recovery, resulting in an estimated recovery of approximately $80 per class member. No class member opted out. Only one class member, Jenna Dickenson, objected to the settlement agreement. Among other objections, she argued that the Supreme Court's decisions in *Greenough* and *Pettus* established binding precedent that prohibited the district court from approving the agreed-upon incentive award to Mr. Johnson. The district court overruled the objections and approved the settlement, concluding that it was "in all respects fundamentally fair, reasonable, adequate, and in the best interest of the class members."[5] Doc. 53 at 4. Ms. Dickenson then appealed.

---

[5] Although the district court did not include this calculation in its order, I note that the incentive award of $6,000 to Mr. Johnson, divided by the approximate

6                    JILL PRYOR, J., Dissenting                    18-12344

On appeal, the panel majority opinion reversed the incentive award portion of the district court's order approving the settlement. Despite acknowledging that incentive awards were "commonplace" in modern class action litigation, the panel majority opinion concluded that the district court lacked the power to approve the $6,000 award to Mr. Johnson in the settlement agreement. *Johnson*, 975 F.3d at 1255–61. The panel majority opinion agreed with Ms. Dickenson that *Greenough* and *Pettus* prohibit incentive awards included in class action settlement agreements. *Id.* at 1260. According to the panel majority opinion, for class representatives to receive incentive awards, either the Supreme Court must overrule its decisions in *Greenough* and *Pettus* or else the "Rules Committee or Congress" would need to "amend Rule 23 or to provide for incentive awards by statute." *Id.* at 1260.

## II.    DISCUSSION

The panel majority opinion misread *Greenough* and *Pettus* to impose a categorical bar on incentive awards for class representatives in class actions. Given the holding's significance to the future of class action litigation,[6] I disagree with the decision of a majority of my colleagues not to rehear this case en banc.

---

number of class members who submitted claims (9,500), would have amounted to $0.63 per class member.

[6] According to data from one prominent class action scholar, courts approved incentive awards in 93.4% of consumer class actions between 2006 and 2011 and in 71.3% of all class actions during that same time period. 1 William B.

18-12344          JILL PRYOR, J., Dissenting          7

To explain my disagreement, I begin with a description of the Supreme Court's decisions in *Greenough* and *Pettus*. I then explain how the panel majority opinion incorrectly interpreted these cases to forbid all incentive awards. Next, I discuss how, in arriving at the conclusion that these two nineteenth century cases were on-point precedent, the majority opinion plucked *Greenough* and *Pettus* out of their historical context and ignored several decades of law developing incentive awards within class action settlements under Rule 23, as well as Congress's and the Supreme Court's inaction on such awards despite intermittent review. I conclude with the real-world implications of the panel majority opinion's holding.

## A.   *Greenough* and *Pettus* Were Products of and Limited to Their Historical Circumstances, Which Pre-dated Rule 23 Class Actions.

The Supreme Court's decisions in *Greenough* and *Pettus* addressed then-unanswered questions about litigation benefitting a common fund before the Supreme Court and the Advisory Committee on Civil Rules created a new form of action and rules answering those very questions. As I explain, the Supreme Court's decision in *Greenough*[7] arose from the fact that, at the time, no existing authority permitted a creditor-plaintiff who was

---

Rubenstein, *Newberg and Rubenstein on Class Actions* § 17:7 (6th ed., June 2022 update).

[7] As the panel majority opinion pointed out, "*Pettus* is significant principally as a reiteration of the dichotomy drawn in *Greenough*." *Jones*, 975 F.3d at 1257. Thus, I focus on *Greenough*.

instrumental in preserving a common fund for the benefit of other creditors to receive compensation from that fund after successfully preserving it. So the Court had to rely on trust and equity principles in defining what compensation was appropriate.

The plaintiff in *Greenough* was a bondholder who sought attorneys' fees and litigation expenses as well as fees for personal services and travel expenses after suing to preserve assets securing bonds owned by himself and others. *Greenough,* 105 U.S. at 530–31. The state of Florida had conveyed several million acres of land to a fund held in a trust as security for bonds issued by the Florida Railroad Company. *Id.* at 528. The bonds' returns depended on the trustees' management of the property held by the fund. *Id.* Francis Vose, one of the bondholders, brought on behalf of himself and other bondholders a lawsuit in equity against the trustees of the fund. *Id.* He alleged that the trustees were selling the fund's land at discounted prices, which harmed the bondholders by diminishing the value of the security for their bonds. *Id.* at 528–29. He sought to set aside earlier land sales as fraudulent conveyances, to enjoin the trustees from selling land in the future, and to appoint a receiver to manage the fund. *Id.* at 529.

Ultimately, after years of litigation, Vose was successful. *Id.* A receiver was appointed, "a large amount of the trust fund was secured and saved," "a considerable amount of money" was realized from the proper sale of the land, and the railroad made payments to Vose and other bondholders to make them whole. *Id.*

18-12344            JILL PRYOR, J., Dissenting                9

After winning the case, Vose sought from the district court an "an allowance out of the fund for his expenses and services." *Id.* A court-appointed special master recommended awarding him attorneys' fees and fees for other "necessary expenditures," such as "sundry expenses" for "copying records and the like." *Id.* at 530, 531. In addition, the special master recommended granting Vose "an allowance of $2,500 a year for ten years" for his "peculiar and great personal services," along with nearly $10,000 in interest and almost $15,000 for his hotel and transportation expenses incurred while prosecuting the case. *Id.* The district court approved the special master's recommendations. *Id.* at 531.

On appeal, the Supreme Court affirmed some components of Vose's award but not others. The Court allowed Vose to retain the money he received for "his reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit, and in reclaiming and rescuing the trust fund." *Id.* at 537. Vose could recover these expenses, the Court reasoned, because it was "a general principle that a trust estate must bear the expenses of its administration." *Id.* at 532. Citing cases from state and English courts, the Supreme Court concluded that "sufficient authority" permitted compensating Vose for his actions to prevent the destruction of a trust. *Id.* at 532–34.

But the Supreme Court vacated Vose's award for collateral expenses—the payments amounting to a salary and the compensation for his railroad fares and hotel bills. *Id.* at 537–38. The Court explained that the reasons for compensating Vose for his

10                    JILL PRYOR, J., Dissenting                    18-12344

"expenditures incurred in carrying on the suit [did] not apply" to the salary and private travel expenses *Id.* at 538. And the Court could "find no authority whatever" that sanctioned awarding Vose, a creditor of the fund, compensation for these collateral expenses. *Id.* at 537–38.

It was this lack of authority that led the Supreme Court to deny Vose compensation for his collateral expenses. By contrast, the Supreme Court readily affirmed the award of his attorney's fees and litigation expenses because common law trust principles authorized repayment for those expenses. But because the Court concluded that trust principles did not guide it as to Vose's compensation for collateral expenses, it would have had to craft a new rule to address these items. In declining to create a rule that would allow creditors to receive the additional compensation Vose sought, the Court reasoned that such awards would "present too great a temptation to parties to intermeddle in the management of valuable property or funds." *Id.* at 538. Perhaps the Court's concern was born of the magnitude of the compensation Vose was awarded: a personal salary for 10 years and lavish travel expenses, totaling more than $1.4 million in today's dollars.[8]

---

[8] *See Consumer Price Index, 1800-*, Federal Reserve Bank of Minneapolis (last visited July 27, 2022), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800- ($1 in 1881 dollars is worth $28.07 in 2021 dollars based on the Consumer Price Index by Ethel D. Hoover).

18-12344          JILL PRYOR, J., Dissenting          11

The Court's later decision in *Central Railroad & Banking Co. v. Pettus* merely repeated this language from *Greenough*; it added nothing to aid our interpretation of the earlier case. In *Pettus*, the Court considered whether attorneys could present independent claims for compensation from a fund created through their efforts on behalf of their clients. *See Pettus*, 113 U.S. at 127–28. The Supreme Court concluded that attorneys who recover a common fund for the benefit of others are entitled to a reasonable fee from the fund. *Id. Pettus* did not concern or address what a *plaintiff* could recover.

*Greenough* can be summed up as follows: Although the common law of trusts allowed Vose to be compensated for his expenses in prosecuting the lawsuit against the funds' trustees, at the time no authority permitted him, a creditor, to receive compensation for collateral expenses connected to his litigation to preserve the value of the bonds for the benefit of all bondholders. The Supreme Court declined to fashion a new common law rule that would authorize this type of compensation due to its fear of creditors running amok with litigation. Of course, Rule 23 class actions as we know them today did not exist. Yet, the panel majority opinion held that *Greenough* created a blanket ban on incentive awards in class actions.[9]

---

[9] The panel majority opinion also failed to address that *Greenough* was based on general federal common law. *Greenough* arose under Florida law. *See Vose v. Fla. R.R Co.*, 28 F. Cas. 1285 (C.C.N.D. Fla. 1870); *Vose v. Internal*

12                  JILL PRYOR, J., Dissenting                  18-12344

B.      **The Panel Majority Opinion Failed to Consider the Histori-
         cal Development of Incentive Awards Within Class Actions.**

The panel majority opinion's myopic focus on *Greenough*
and *Pettus* ignored the advent of Rule 23 and the development of
the modern class action that took place in the intervening 140 years
between those cases and this one. This history is important because

---

*Improvement Fund*, 28 F. Cas. 1286 (C.C.N.D. Fla. 1875). When the Supreme
Court issued its decision in *Greenough*, the regime of *Swift v. Tyson*, 41 U.S.
1 (1842), governed, and federal courts applied a general common law when
addressing state-law issues in diversity cases. To divine the general common
law in *Greenough*, the Supreme Court relied on both old English cases and
state court cases to determine what Vose could receive as compensation
which was the correct approach at the time. *See Black & White Taxicab &
Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533
(1928) (Holmes, J., dissenting) ("[Federal] common law . . . cite[s] cases from
[the Supreme] Court, from the Circuit Courts of Appeal, from the State
Courts, from England and the Colonies of England."). But, in 1938, the Court's
*Erie* decision renounced reliance on federal general common law, famously
recognizing that "[t]here is no federal general common law." *Erie R.R. Co. v.
Tompkins*, 304 U.S. 64, 78 (1938). One additional reason to be wary of *Green-
ough* is that it created general common law to resolve what was a state-law
issue. Here the question of incentive payments is a federal question governed
solely by federal law. And with respect to federal law *Greenough* is "no longer
. . . legally authoritative because it was based on the federal courts' subse-
quently abandoned authority to formulate common law principles in suits
arising under state law though litigated in federal court." *McKevitt v. Pallasch*,
339 F.3d 530, 534 (7th Cir. 2003).

18-12344          JILL PRYOR, J., Dissenting          13

incentive awards evolved within the framework of class actions under Rule 23. I begin this section by providing a brief history of the modern class action and the role of incentive awards within it. I then explain how the panel majority's decision disregards the vast development of the legal landscape that occurred between *Greenough* and *Johnson*.

      1.      The Modern Class Action Emerged with the Creation and Revision of Rule 23, and Incentive Awards Arose and Developed in the Context of This Rule.

The development of Rule 23 of the Federal Rules of Civil Procedure ushered in an entirely new regime for the federal courts' treatment of collective actions.[10] Before Rule 23, class actions did not exist as we know them today but were merely "an outgrowth of the compulsory joinder rule that prevailed in courts of equity." 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 1:13 (6th ed., June 2022 update) [hereinafter *Newberg*]. Under equity's regime, the Supreme Court tried during the nineteenth century to deal with "group representative litigation" through Equity Rule 48. 1 Joseph M. McLaughlin, *McLaughlin on Class*

---

[10] I use "collective actions" to refer generally to actions brought by a representative plaintiff or plaintiffs who makes claims on behalf of other similarly-situated individuals against the same defendant or defendants, rather than specifically to the mechanism provided to employees under the Fair Labor Standards Act. *See* 29 U.S.C. § 216(b) ("An action to recover . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.").

14                    JILL PRYOR, J., Dissenting                    18-12344

*Actions* § 1:1 (18th ed., Oct. 2021 update) [hereinafter *McLaughlin*] (internal quotation marks omitted). But this rule had the significant limitation of lacking binding effect: any decree submitted under it would "be without prejudice to the rights and claims of all the absent parties." *Id.* (internal quotation marks omitted). After the merger of law and equity, the Supreme Court promulgated the original Rule 23 in 1938. *Newberg* § 1:14. The rule suffered from several deficiencies, however. It divided class actions into three difficult-to-apply categories.[11] *McLaughlin* § 1:1. And it failed to prescribe how class action suits advance through litigation. *Newberg* § 1:14. "Under heavy criticism, [the original rule] was completely rewritten, and sweeping innovations were introduced with the 1966 amendments." *Id.*

---

[11] The original Rule 23 categorized class suits based on the "'jural relations' of the parties." *Newberg* § 1:14. The rule authorized a representative suit where the right to enforcement was:

> (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;
>
> (2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or
>
> (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought.

*Id.*

18-12344                JILL PRYOR, J., Dissenting                15

The modern class action emerged with the implementation of the 1966 amendments. *McLaughlin* § 1:1. With the new Rule 23, the Advisory Committee on Civil Rules hoped to "correct technical flaws" with the original Rule 23's difficult-to-apply categories "and bring [the] badly shopworn procedural rule in line with caselaw developments." David Marcus, *The History of the Modern Class Action, Part I: Sturm Und Drang, 1953–1980*, 90 Wash. U. L. Rev. 587, 599 (2013). Alongside this more modest goal, a major purpose of the new rule was to "provide a method of protecting the rights of those who would not realistically bring individual claims for practical reasons."[12] *McLaughlin* § 1:1. This goal was in accord with a belief that the new Rule 23 should not "freez[e] out the claims of people" especially disadvantaged people with small value claims. Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 398 (1967).

Not long after the new Rule 23's implementation, federal courts began to recognize that under the Rule class representatives could receive benefits—beyond what the class received—for their efforts in bringing and maintaining lawsuits to vindicate not only their own rights but the rights of other class members. *See, e.g.,*

---

[12] For example, the Advisory Committee envisioned the new rule as a tool "which could deal with civil rights and, explicitly, segregation." John P. Frank, *Response to 1996 Circulation of Proposed Rule 23 on Class Actions, in* 2 Working Papers of the Advisory Committee on Civil Rules on Proposed Amendments to Civil Rule 23 at 266 (1997), https://perma.cc/9SJW-KMXK.

16                    JILL PRYOR, J., Dissenting                    18-12344

*Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 59 F.R.D. 616, 617 (W.D. Pa. June 12, 1973) (approving "special awards in the aggregate amount of $17,500 to those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class."), *aff'd*, 494 F.2d 799 (3d Cir. 1974); *Lo Re v. Chase Manhattan Corp.*, No. 76 Civ. 154, 1979 WL 236, at *6 (S.D.N.Y. May 25, 1979) (approving award for class representatives because they, among other things, "initiated this action at some risk to their own job security."). In 1974, the Sixth Circuit became the first circuit to examine the propriety of awarding additional benefits to plaintiffs for their time and effort in pursuing litigation that benefited other plaintiffs in the class. *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 420 (6th Cir. 1974). In that case, the district court held that a motor freight company violated Title VII by employing a discriminatory transfer policy that prevented Black drivers from accessing certain jobs. *Id.* at 419. The district court ordered the company to rescind its transfer policy and awarded the Black drivers "who actively sought an end" to the policy with extended seniority in the positions previously foreclosed to them. *Id.* at 420. The Sixth Circuit affirmed, explaining that "there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination." *Id.*

During the 1980s and 1990s, incentive awards proliferated. *See Re Continental/Midlantic S'holders Litig.*, Civ. A. No. 86–6872, 1987 WL 16678, at *4 (E.D. Pa. Sept. 1, 1987) ("Plaintiffs'

18-12344                JILL PRYOR, J., Dissenting                    17

counsel have provided numerous citations in this district, in this circuit and elsewhere, in which substantial incentive payments to named plaintiffs . . . have been made."); *In re Dun & Bradstreet Credit Servs. Customer Litig*, 130 F.R.D. 366, 373–74 (S.D. Ohio Feb. 23, 1990) (collecting cases). "By the turn of the century," incentive awards were commonplace. Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1311 (2006).

Despite the widespread acceptance of incentive awards, almost since their inception, courts have worried that they might be unfair to the other class members. *See, e.g.*, *Plummer v. Chem. Bank*, 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("While there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as prima facie evidence that the settlement is unfair to the class."); *Women's Comm. for Equal Emp. Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977) (approving settlement with incentive awards "notwithstanding our doubts about a general policy of awarding class representatives a settlement on terms different from the other class members"). To address this concern, courts developed tests "to identify the appropriate conditions" for granting incentive awards. Eisenberg & Miller, *supra*, at 1311. Under this regime, a party seeking an incentive award for the class representative has the "burden of proving" that the class representative

18                      JILL PRYOR, J., Dissenting                      18-12344

"deserve[s] an award" and that it is "reasonable" before a court can approve it.[13] *Newberg* § 17:13.

Our own circuit's law tracks our sister circuits' development of safeguards around incentive awards. In *Holmes v. Continental Can Co.*, we recognized that "[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983). The panel majority opinion brushed aside *Holmes* as having nothing to do with incentive awards. *Johnson*, 975 F.3d at 1261 n.13. Although *Holmes* does not mention incentive awards specifically, that fact does not render it irrelevant as a bulwark against potential incentive award abuses. An incentive award creates an unequal settlement distribution between the class representatives and the other class members, thus triggering *Holmes*'s requirement that the proponents of the settlement demonstrate its fairness.

As this history shows, federal courts have had decades to examine Rule 23's authorization of incentive awards in class action settlements, to evaluate these awards' costs and benefits, and to develop safeguards to prevent them from resulting in unfair

---

[13] To decide whether this burden has been met, courts look at a variety of factors including the class representatives' specific services to the class, any potential risks they incurred, and the amount of the incentive award in comparison to the overall recovery. *See Newberg* § 17:13 n.7 (collecting tests used by different circuits for approving incentive awards).

18-12344             JILL PRYOR, J., Dissenting             19

settlements. Yet I cannot find a single case before this one in which a court concluded that *Greenough* precludes their approval under Rule 23.

The silence concerning *Greenough*'s impact on incentive awards extends to the United States Supreme Court, as Judge Martin observed in her dissent to the panel majority opinion. In *Frank v. Gaos*, 139 S. Ct. 1041, 1043 (2019), the Supreme Court considered whether a settlement agreement that would distribute several million dollars among the named plaintiffs, class counsel, and *cy pres* recipients[14] satisfied Rule 23. The settlement agreement included "incentive payments" for the named plaintiffs. *Id.* at 1045. The Supreme Court majority remanded the case based on standing, so it had no reason to address the incentive awards. *Id.* at 1046. Justice Thomas wrote in dissent that the Court should address the merits and conclude that the settlement agreement did not comply with Rule 23. *Id.* at 1046–1049 (Thomas, J., dissenting). He criticized the settlement agreement because of the *cy pres* and incentive payments. *Id.* at 1047. He explained that the incentive payments for the named plaintiffs and the lack of monetary relief for the other class members "strongly suggest[ed] that the interests of the class were not adequately represented." *Id.* Granted, it appears that no party raised the *Greenough* argument in *Frank*, but the

---

[14] In class actions, "*cy pres* refers to the practice of distributing settlement funds not amenable to individual claims or meaningful pro rata distribution to nonprofit organizations whose work is determined to indirectly benefit class members." *Frank v. Gaos*, 139 S. Ct. 1041, 1045 (2019).

20                    JILL PRYOR, J., Dissenting                    18-12344

argument was not unknown because it had been raised previously in *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 466–67 (10th Cir. 2017).[15] Like Judge Martin, I find it notable that Justice Thomas's analysis focused solely on Rule 23; he did not mention *Greenough* or *Pettus*. Nor did he suggest that incentive awards are illegal per se. Instead, his dissent simply noted that a settlement in which only class representatives receive monetary awards may fail to comply with Rule 23.

Indeed, a year before *Frank*, the Supreme Court acknowledged that a class representative "might receive a share of class recovery above and beyond her individual claim." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018) (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming a class representative's $25,000 incentive award)). The panel majority opinion dismissed the Supreme Court's reference to incentive awards as dicta, noting that the Court "didn't cite or consider—let alone overrule—*Greenough* and *Pettus*." *Johnson*, 975 F.3d at 1260 n.12. True, but I suggest that the Supreme Court did not mention *Greenough* and *Pettus* because those cases have nothing to say about the lawfulness of incentive awards in settlements under Rule 23.

Congress and the Advisory Committee on Civil Rules, too, have been aware of the rise of incentive awards for decades, yet

---

[15] The Tenth Circuit treated the argument as forfeited below, however, and did not decide it.

18-12344                JILL PRYOR, J., Dissenting                21

they have never acted to impose a blanket ban on such awards. This silence stands in stark contrast to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), in which Congress prohibited incentive awards or special payments for class representatives in securities class action settlements. *See* 15 U.S.C. § 78u-4(a)(2)(A) (requiring each plaintiff who seeks to serve as class representative to provide a sworn certification stating that she "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery"); *see id.* § 78u-4(a)(4) ("The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class.").[16] From the PSLRA, we can see that Congress knows how to ban class representative incentive awards when it wants to do so. Yet Congress has not acted to ban inventive awards in any other class action context. And this is so despite its observation in the Class Action Fairness Act ("CAFA") that "[c]lass members often receive little or no benefit from class actions, and are sometimes harmed, such as where . . . unjustified awards are made to certain plaintiffs at the expense of other class members." Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2, 119 Stat. 4 (2005). Congress's inaction toward incentive awards in most class action contexts suggests that it

---

[16] *But see Newberg* § 17:19 ("Most, *though not all*, courts have read these provisions as barring incentive awards.") (emphasis added).

does not view these awards as illegal or even as the type of "unjustified awards" identified in the CAFA. *Id.*

As for the Advisory Committee, at its request in 1996, the Federal Judicial Center collected and analyzed empirical data on incentive awards. *See* Thomas E. Willging, et al., *An Empirical Analysis of Rule 23 To Address the Rulemaking Challenges*, 71 N.Y.U. L. Rev. 74, 101 (1996). After receiving the Federal Judicial Center's report demonstrating the prevalence and scope of these awards, tellingly, the Advisory Committee took no action to limit them.

As I have shown, incentive awards grew out of the 1966 revised version of Rule 23 under the watchful eyes of the courts, the Advisory Committee, and Congress. I now turn to why the panel majority opinion's failure to account for the historical development of incentive awards led to its erroneous holding.

      2.     The Panel Majority Opinion Misapplied *Greenough* to a Context Completely Changed by Rule 23.

The panel majority opinion deemed the compensation Vose sought in *Greenough* "roughly analogous" to incentive awards in class action settlement agreements. *Johnson*, 975 F.3d at 1257. This rough analogy crumbles upon closer inspection. As I have explained, the *Greenough* court concluded that there existed no general federal common law authorizing compensation for the type of collateral expenses Vose sought to recover. In *Greenough* the Court was not examining a class action settlement and obviously could not rely on the revised Rule 23, which would not exist for

18-12344                JILL PRYOR, J., Dissenting                23

another 85 years. And so, of course, *Greenough* is silent as to whether Rule 23 allows a court to approve an incentive award.

Despite recognizing that the *Greenough* Court rejected Vose's requested compensation because the district court was "without legal basis" to approve the award from a common fund, *Johnson*, 975 F.3d at 1257, the panel majority opinion nonetheless leapt to the conclusion that *Greenough* broadly forbids any incentive award in the class action context. The panel majority opinion also failed to wrestle with the fact that Vose sought more than 1.4 million in today's dollars, which exceeds by orders of magnitude both the $6,000 incentive award in this case and average incentive awards in class action settlements.[17] By plucking *Greenough* out of its context and disregarding the development of class actions to conclude that *Greenough* dictates the outcome in this case, the panel ignored the wisdom of Chief Justice Marshall (which the Supreme Court has continually invoked) "that 'general expressions, in every opinion, are to be . . . respected, but ought not . . . control the judgment in a subsequent suit.'" *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 35 (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 399 (1821)); *see also Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1518 n.2 (2020) (Thomas, J., dissenting) ("The proper approach is to 'read general language in judicial opinions . .

---

[17] An empirical study reviewed approximately 1,200 class actions from 2006–2011 and reported that the average incentive award per class representative was $11,697 (or $14,371 in 2021 dollars). *Newberg* § 17:8.

. as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'") (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)).

The panel majority opinion paid scant attention to Rule 23, noting that the rule does not explicitly mention incentive awards. *Johnson*, 975 F.3d at 1257. But the opinion failed to engage with Rule 23(e)(2)(D)'s requirement that in approving proposed settlement agreements courts must evaluate whether the agreement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Incentive awards are subject to this requirement, which addresses one of the primary objections that has been levied against incentive awards. *See Newberg* § 17:4 ("[Rule 23(e)] most obviously protects absent class members from being subjected to excessive incentive awards[.]"). The Supreme Court in *Greenough* worried that Vose's award for collateral expenses—which, of course, the district court did not review under Rule 23(e)—would present too great a temptation for intermeddling in lawsuits. The panel majority opinion argues that those concerns are present in the class action context as well. But the panel majority's worries about whether incentive awards are good policy does little to strengthen its legal argument about the scope and breadth of *Greenough's* holding. And, again, this argument represents a mistaken attempt to apply *Greenough* to a context irrevocably altered by Rule 23. Rule 23 defuses the potential for parties to intermeddle because under Rule 23(e) courts must reject incentive awards that

are excessive compared to the service provided by the class representative or that are unfair to the absent class members. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945–46 (9th Cir. 2011) ("[B]ecause the parties expressly negotiated a possibly unreasonable amount of fees, and because the district court did not take this possibility into account in reviewing the settlement's fairness the first time around, we must vacate and remand the Approval Order as well, so that the court may appropriately factor this into its Rule 23(e) analysis.").

It could equally well be argued that had Congress or the Advisory Committee wanted to disallow any award that treats class members inequitably relative to one another, they could have done so, as Congress effectively did in the PSLRA. So, the lack of an express reference to incentive awards in Rule 23 does not help the panel majority's argument.

More likely, the reason incentive awards have not been disallowed is that a class representative's responsibilities are often time-consuming and burdensome. *See* Amicus Br. of Impact Fund at 5–8. A class representative's activities may also expose her to reputational risk and even financial, emotional, and physical harm. *Id.* at 8–12. Indeed, the leading treatise on class actions observes that "if the class representatives face particular risks in serving the class and/or undertake valuable work on behalf of the class but cannot recover any of the costs of those efforts through an incentive award, they have a fair argument [under Rule 23(e)(2)(D)] that the settlement is not treating them *equitably* relative to absent class

members." *Newberg* § 17:4 (emphasis in original). The panel majority opinion failed to acknowledge, much less grapple with, its inconsistency with the rule.

To sum up, the panel majority opinion disregarded that in between *Greenough* and *Johnson*, the modern class action was created, developed, studied, and tweaked. The panel majority opinion did not satisfactorily explain how *Greenough* can be read as barring courts from approving incentive awards under Rule 23. It also did not address the inconsistencies its holding creates with Rule 23's requirements that all class members be treated equitably.

## C.     The Panel Majority Opinion Is in Tension with Decisions of All Other Circuits and Has Severe Implications on Class Action Viability.

The panel majority opinion not only misread *Greenough* and *Pettus*, it also created a split among circuits by distinguishing ours as the only circuit to read these cases as barring incentive awards for class action representatives. The Second Circuit expressly considered and rejected the argument that *Greenough* and *Pettus* forbid incentive awards. *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019). And all circuits—including ours[18]—

---

[18] *See Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 763 (11th Cir. 2017) (unpublished) (affirming the district court's approval of a settlement that included a $15,000 incentive award for the class representative); *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 432 (11th Cir. 2012) (unpublished) (affirming the district court's approval of a settlement where one named plaintiff received a $10,000 incentive award, four named plaintiffs each received $2,500

18-12344          JILL PRYOR, J., Dissenting          27

have universally accepted—and affirmed district courts' approval of—settlement agreements incorporating these awards. *See, e.g., Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 296 (5th Cir. 2017) (vacating a class action settlement with an incentive award on other grounds and affirming the same settlement after district court provided further explanation in 742 F. App'x 846 (5th Cir. 2018)); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 861 (8th Cir. 2017); *Pelzer v. Vassalle*, 655 F. App'x 352, 360 (6th Cir. 2016) (unpublished); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015); *Tennille v. W. Union Co.*, 785 F.3d 422, 434–36 (10th Cir. 2015); *Berry v. Schulman*, 807 F.3d 600, 613–14 (4th Cir. 2015); *Cobell v. Salazar*, 679 F.3d 909, 922–23 (D.C. Cir. 2012); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 290 (3d Cir. 2011) (en banc); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722–23 (7th Cir. 2001); *In re Mego Fin. Corp. Sec. Lit.*, 213 F.3d 454, 463 (9th Cir. 2000). Although courts infrequently question incentive awards based on suspicion of collusion or unfairness, there is "near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000–$20,000." *McLaughlin* § 6:28. The panel majority opinion brushed aside this near-universal acceptance of incentive awards as "a product of inertia and inattention, not adherence to law." *Johnson*, 975 F.3d at 1259. I find it difficult to believe that for decades

---

incentive awards, and the remaining named plaintiffs each received $1,000 incentive awards).

28                    JILL PRYOR, J., Dissenting                    18-12344

we and all our sister circuits have missed what the panel majority saw as a bright line drawn by the Supreme Court.

The circuit split created by the panel majority opinion does not just make good fodder for law review articles; it has very real-world implications. In line with the Advisory Committee's goals in 1966, courts have recognized that Rule 23 allows plaintiffs in class actions "to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). In our circuit, we have repeatedly acknowledged this core purpose of class action. *See Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1240 n.21 (11th Cir. 2000) (recognizing that the "most compelling justification for a Rule 23(b)(3) class action [is] the possibility of negative value suits"); *In re Charter Co.*, 876 F.2d 866, 871 (11th Cir. 1989) ("[T]he effort and cost of investigating and initiating a claim may be greater than many claimants' individual stake in the outcome, discouraging the prosecution of these claims absent a class action filing procedure."). Our outlier rule, however, potentially undermines this purpose in our circuit and threatens the viability of consumer class actions in particular.[19] *See* Eisenberg

---

[19] *Johnson* has already begun to impact settlement agreements in consumer class actions. Bound to follow it, a panel of this Court has reversed an incentive award in a settlement of a class action asserting violations of the Fair Credit Reporting Act. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1257 (11th Cir. 2021). Post-*Johnson*, district courts have denied incentive awards in settlements of class actions brought under the Fair Debt Collection Practices Act, the Fair Labor Standards Act, the Telephone Consumer Protection Act, and state consumer protection laws. *See Kuhr v. Mayo Clinic*

18-12344            JILL PRYOR, J., Dissenting            29

& Miller, *supra*, at 1305–06 (2006) (noting that in consumer class actions "a class member may even experience a net loss from acting as class champion because the small recoveries . . . are not enough to cover the increased costs of serving as the named plaintiff").

In consumer class actions especially, "damages per class member tend to be slight." *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012). Yet a class representative may spend hundreds of hours providing essential services for the litigation. *See* Amicus Br. of The Committee to Support the Antitrust Laws at 6–8. Without the "prospect of an incentive award," potential class representatives understandably may be reluctant to take on these responsibilities.[20] *Espenscheid*, 688 F.3d at 876. The public will be

---

*Jacksonville,* 530 F. Supp. 3d 1102, 1108 n.1 (M.D. Fla. 2021) (Fair Debt Collection Practices Act); *Poblano v. Russell Cellular Inc.*, 543 F. Supp. 3d 1293, 1294 (M.D. Fla. 2021) (Fair Labor Standards Act); *Drazen v. GoDaddy.com, LLC*, No. 1:19-00563-KD-B, 2020 WL 8254868, at *1, 14 (S.D. Ala. Dec. 23, 2020) (Telephone Consumer Protection Act); *Fruitstone v. Spartan Race, Inc.*, No. 20-cv-20836, 2021 WL 2012362, at *1, 13 (S.D. Fla. May 20, 2021) (Florida Deceptive and Unfair Trade Practices Act).

[20] The majority opinion is wrong to characterize incentive awards as "bounty" and "promot[ing] litigation by providing a prize to be won." *Johnson*, 975 F.3d at 1258. It is true that the prospect of an incentive award might encourage plaintiffs to serve as class representatives, but the award's purpose is to enable suits against defendants who cause widespread harms that are of low dollar value to individual plaintiffs, not to promote unnecessary or frivolous litigation. And, as I explained, if an incentive award is so large as to be unfair or compromise the interest of the class, the court reviewing the settlement agreement must reject it under Rule 23(e).

the ultimate loser from this undermining of class actions as an important tool for protecting consumers. *See* Jason Jarvis, *A New Approach to Plaintiff Incentive Fees in Class Action Lawsuits*, 115 Nw. U. L. Rev. 919, 928 (2020) ("[A]bsent an incentive fee, a multimillion-dollar consumer class action case might not be brought for want of a named plaintiff. Therefore, when individual recoveries are small, incentive fees provide a necessary enforcement mechanism for consumer-protection statutes."); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original).

The effects of *Johnson* will be felt by small businesses, too. Class actions are an important tool for small businesses to combat anticompetitive business practices. *See* Amicus Br. of Main Street Alliance at 5–6. As one scholar has written, class actions are "the most effective way to hold corporations accountable" and ensure trust in the free market by disincentivizing theft, breach of contract, and fraud. Brian T. Fitzpatrick, *The Conservative Case for Class Actions* 3, 22–28 (2019). Despite these benefits of business class actions, the small businesses that serve as class representatives face daunting challenges. A small-business class representative must devote significant time to the litigation which otherwise could be devoted to running the business. *See, e.g., Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 342 (E.D. Pa. 2007) (approving incentive award

because class-representative small business devoted four years to the litigation, including providing and preparing a representative for nine depositions); *In re Navistar Maxxforce Engines Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 1:14-cv-10318, 2020 WL 2477955, at *4 (N.D. Ill. Jan. 21, 2020) (approving incentive awards to class-representative businesses because they sat for depositions, searched through thousands of documents to respond to discovery, and presented their defective equipment for inspection). In addition, small-business class representatives may face retaliation and reputational harm, especially in the antitrust context. *See* Amicus Br. of The Committee to Support the Antitrust Laws at 4–6. The panel majority's holding extinguished one way to assure small business owners that their businesses will not wind up worse off for attempting to vindicate their own and other small businesses' rights.

The panel majority's reading of *Greenough*—which applied federal common law and equitable principles in the absence of any authority like Rule 23—as banning incentive awards placed this circuit at odds with more than 50 years of class action law and decisions from every other federal court in the country. And this is not some esoteric disagreement. The opinion has already begun to eliminate incentive awards, and although it is too early to measure, I expect that it will have a very real and detrimental impact on class actions in this circuit, an impact that will be felt not least by the most vulnerable plaintiffs such as consumers and small businesses. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 723 (7th Cir. 2001)

(recognizing that the "lure of an 'incentive award'" can cause a named plaintiff to initiate suit when she would not have otherwise).

### III.    CONCLUSION

The panel majority opinion fundamentally undermined class action law based on a misinterpretation of two Supreme Court cases that long preceded the creation of the modern class action. No other circuit has gone down this path. Given the panel majority opinion's novel reading of these cases, the circuit split it occasioned, and the magnitude of its likely impact, this case is more than worthy of en banc review. Unfortunately, by denying rehearing en banc, our court has struck a lasting blow to class actions as a device for righting wrongs in this circuit.

Given our failure to act, it will be up to the Supreme Court to overrule or clarify *Greenough* and *Pettus* to undo this problem of our making. If the Supreme Court does not act, then I urge either the Advisory Committee on Civil Rules to amend Rule 23 or Congress to enact a statute that explicitly authorizes incentive awards. *See Johnson*, 975 F.3d at 1260. Respectfully, I dissent from the denial of rehearing en banc.